United States Court of Appeals,

Eleventh Circuit.

No. 95-3077.

Mervin GORDON, Plaintiff-Appellee,

v.

E.L. HAMM & ASSOCIATES, INC., Defendant-Appellant.

Dec. 4, 1996.

Appeal from the United States District Court for the Middle District of Florida. (No. 93-1597-Civ-J-10), Wm. Terrell Hodges, Judge.

Before COX, Circuit Judge, HILL, Senior Circuit Judge, and VINING[*], Senior District Judge.

VINING, Senior District Judge:

## I. *INTRODUCTION*

In this appeal, we review the district court's denial of the defendant's renewed motion for judgment as a matter of law on the plaintiff's claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.,* on which the jury returned a verdict for the plaintiff. The district court concluded that evidence adduced at trial supported the jury's finding that the plaintiff was a "qualified individual with a disability" under the ADA. We **REVERSE** the judgment of the district court and **REMAND** the matter to the district court and direct it to enter judgment for the defendant on the ADA claim.

## II. *PROCEDURAL AND FACTUAL BACKGROUND*

In December 1993, Mervin Gordon filed suit against Hamm &

[*]Honorable Robert L. Vining, Jr., Senior U.S. District Judge for the Northern District of Georgia, sitting by designation.

Associates, Inc. ("Hamm"), alleging that Hamm unlawfully discriminated against him on the basis of his disability and age, in violation of the ADA, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*. A jury subsequently rendered a verdict for Gordon on the ADA claim and for Hamm on the ADEA claim.

Following the verdict, Hamm filed a renewed motion for judgment as a matter of law or, alternatively, a motion for a new trial.  The district court denied the motion, and this appeal followed.

In 1992 Hamm contracted with the United States Navy to perform on-site maintenance for military housing at an air station in Jacksonville, Florida.  Thereafter, Hamm hired Gordon in January 1993 to work on this project.  Gordon's duties included performing general maintenance work, especially work that focused on air conditioning, heating, and refrigeration repair.  At all times during his employment with Hamm, Gordon's immediate supervisor was Ken Van Horn. Van Horn was the work leader at the site and was responsible for ensuring that all work was completed in a timely fashion.

In May 1993, Gordon's physician determined that he had a cancerous growth on his shoulder.  An oncologist, Dr. Jadeja, subsequently confirmed that Gordon had malignant lymphoma.  Dr. Jadeja ordered a bone marrow test to determine how extensive the cancer was and to assess Gordon's prognosis and possible treatment. From June 18 until June 28, 1993, Gordon took an extended medical leave of absence to undergo the bone marrow test.  The bone marrow

test revealed that the cancer had not spread anywhere else in Gordon's body. Dr. Jadeja recommended that Gordon undergo a series of treatments, consisting of blood tests once a week and chemotherapy once every three weeks.

On June 25, 1993, Gordon received his first chemotherapy treatment and continued on his schedule of treatments until November 1, 1993. According to Dr. Jadeja, Gordon was able to continue with his normal activities during the treatments. He noted that Gordon's life activities were limited by the chemotherapy to the extent that Gordon had to go to the doctor's office, receive the treatments, and endure the side effects that often occur in many patients. The side effects that Gordon experienced included weakness, dizziness, swelling of the ankles and hands, numbness of the hands, the loss of body hair, and vomiting.

Gordon was released for work by his doctors on June 28, 1993, and on that date he appeared at work, prepared to commence his duties. Hamm, however, did not return Gordon to work at that time. According to Gordon, Van Horn would not permit him to work and instructed him to contact Hamm's home office in Virginia Beach, Virginia. Gordon subsequently attempted to contact Bobby Davis, Hamm's vice president who oversaw the project in Jacksonville, at Hamm's home office. On July 7, Gordon was finally able to speak with Davis about his work situation. Davis instructed Gordon to report to work on July 8 and further stated that Hamm would accommodate Gordon to the best of its ability. Davis told Gordon that if his situation changed or if he had problems at work he

should call him back.  During the telephone conversation, Gordon did not complain about any alleged problems he had been having with Van Horn.

On July 8, Gordon returned to work, physically capable of performing his duties as a repairman.  The accommodations that Gordon needed as a result of his cancer included leaving work a couple of hours early every Friday for blood testing and chemotherapy.  Gordon asserts that upon his return to work on July 8 the terms, conditions, and privileges of his job had changed substantially.  Specifically, he alleges that he was no longer assigned to heating ventilation and air conditioning work but was required to perform general maintenance-type work.  Gordon also claims that Van Horn assigned him to more physically taxing work.  In addition, he asserts that he no longer had access to a company vehicle as he had prior to commencing his period of medical leave.  Moreover, he contends that he was not re-issued a set of keys so that he could access units at the air station which needed repairs.

On July 16, Gordon and Van Horn had a dispute after Gordon inadvertently cut a window shade for one of the units at the air station improperly.  A confrontation ensued, and Gordon contends that Van Horn informed him that he was fired, that he did not want Gordon at the air station, and that Gordon was attempting to sabotage his job.  Van Horn admits that he was upset and that he questioned Gordon as to whether he was trying to sabotage Van Horn's job.  Van Horn denies, however, that he fired Gordon. Instead, he claims that he simply told Gordon to go home.

After the confrontation at the housing unit, Gordon and Van

Horn eventually rode back to Hamm's office together. During the ride back to the office, the dispute was not discussed. According to Gordon, when they arrived at the office, Van Horn told him that when he got his "head screwed on" he could call him about his job. R5-103-214. Van Horn agrees that he informed Gordon to call him after both of them had cooled down. Gordon thereafter went into the office, signed out, and went home. Gordon did not subsequently talk to Davis or Van Horn about this incident. He did, however, contact an attorney, who later wrote Hamm, requesting that Gordon be reinstated. Hamm declined to reinstate Gordon allegedly because Gordon failed to contact Van Horn or Davis as instructed and because it had been able to complete the project work in a timely fashion without adding to the staff.

III. *THE ISSUES ON APPEAL AND STANDARD OF REVIEW*

Hamm contends that there was insufficient evidence adduced a trial to support the jury's finding that Gordon had a disability under the ADA. Specifically, it asserts that Gordon is not a "qualified individual with a disability" under the ADA, as Gordon neither had a physical or mental impairment that substantially limited one or more of his major life activities, nor was he regarded by Hamm as having such an impairment. Accordingly, Hamm argues that the district court erred by denying its renewed motion for judgment as a matter of law on the ADA claim.[1]

In reviewing a district court's disposition of a renewed

---

[1] Because we conclude that there is insufficient evidence in the record to support a finding that Gordon is a "qualified individual with a disability" under the ADA, we need not address Hamm's other contentions.

motion for judgment as a matter of law, an appellate court employs the same standard utilized by the district court in determining whether to grant the motion. *Walker v. NationsBank of Florida,* 53 F.3d 1548, 1555 (11th Cir.1995). In determining whether to grant such a motion, a court should consider all of the evidence in the light most favorable to the nonmoving party and with all reasonable inferences drawn in favor of such party. *Id.* at 1555; *MacPherson v. University of Montevallo,* 922 F.2d 766, 770 (11th Cir.1991). If the facts and inferences are so strong that a court opines that reasonable persons in the exercise of impartial judgment could not arrive at a contrary verdict, a district court must grant a renewed motion for judgment as a matter of law. *Id.* If, however, the evidence is such that reasonable and fairminded individuals in the exercise of impartial judgment might reach different conclusions, a court must deny the motion. *Id.* Nevertheless, a jury question does not exist because of the presence of a mere scintilla of evidence; rather, there must be a conflict in substantial evidence to create a question for the jury. *Walker,* 53 F.3d at 1555; *Verbraeken v. Westinghouse Electric Corporation,* 881 F.2d 1041, 1045 (11th Cir.1989).

## IV. *THE LEGAL ANALYSIS*

The ADA provides that no covered employer shall discriminate against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In the ADA,

Congress has imposed upon employers the duty to provide reasonable accommodations for known disabilities unless doing so would result in an undue hardship to the employer. 42 U.S.C. § 12112(b)(5)(A). In order to establish a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate that (1) he has a disability; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination as the result of his disability. *Pritchard v. Southern Company Services,* 92 F.3d 1130, 1132 (11th Cir.1996); *Morisky v. Broward County,* 80 F.3d 445, 447 (11th Cir.1996). In addition, a plaintiff must demonstrate that the employer had either actual or constructive knowledge of the disability or considered the employee to be disabled. *Morisky,* 80 F.3d at 448; *see also Hedberg v. Indiana Bell Telephone Co., Inc.,* 47 F.3d 928 (7th Cir.1995).

A "qualified individual with a disability" is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). In the ADA, Congress has defined "disability" as a(1) physical or mental impairment that substantially limits one or more of the major life activities of an individual; (2) a record of such impairment; or (3) being regarded as having such impairment. 42 U.S.C. § 12102(2). An individual is deemed to be "disabled" for purposes of the ADA if he satisfies any one of these three enumerated definitions. A physical impairment, standing alone, however, is

not necessarily a disability as contemplated by the ADA.[2]
*Pritchard,* 92 F.3d at 1132; *Ellison v. Software Spectrum, Inc.,* 85
F.3d 187, 191 (5th Cir.1996). The ADA requires that the impairment
substantially limit one or more of the individual's major life
activities. *Id.; see also Dutcher v. Ingalls Shipbuilding,* 53
F.3d 723, 725-26 (5th Cir.1995)

A. Physical Or Mental Impairment That Substantially Limits One Or
More Major Life Activities

Hamm argues that the evidence produced at trial failed to
establish that Gordon had a physical or mental impairment that
substantially limited one or more of his major life activities.
Gordon counters, asserting that the evidence adduced at trial was
more than sufficient to demonstrate that he had such an impairment.
He contends that the evidence established that the side effects
that he suffered as the result of his chemotherapy treatments
qualified as "physical impairments" under the ADA and that these
impairments substantially limited his major life activities of
caring for himself and working.

---

[2]The EEOC defines a physical or mental impairment as
follows:

(1) Any physiological disorder, or condition, cosmetic
disfigurement, or anatomical loss affecting one or
more of the following body systems:  neurological,
musculoskeletal, special sense organs, respiratory
(including speech organs), cardiovascular,
reproductive, digestive, genito-urinary, hemic and
lymphatic, skin, and endocrine;  or

(2) Any mental or psychological disorder, such as
mental retardation, organic brain syndrome,
emotional or mental illness, and specific learning
disabilities.

29 C.F.R. § 1630.2(h)(1)(2).

While the ADA defines neither "major life activities" nor "substantially limits," courts may rely upon the regulations promulgated by the Equal Employment Opportunity Commission ("EEOC") for guidance. *See* 42 U.S.C. § 12116 (requiring the EEOC to issue regulations to implement Title I of the ADA); *Dutcher,* 53 F.3d at 726. The ADA regulations adopt the definition of "major life activities" found in the Rehabilitation Act regulations. *See* 34 C.F.R. § 104. This term is defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). In this regard, the EEOC has provided that courts should consider the following three factors when determining whether an impairment substantially limits a major life activity: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2); *Dutcher,* 53 F.3d at 726; *Bolton v. Scrivner, Inc.,* 36 F.3d 939 (10th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995).

Further, courts may consider three additional factors when an individual claims a substantial limitation in the major life activity of work. They include: (1) the geographical area to which the individual has reasonable access; (2) the job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills, or abilities, within that geographical area, from which the

individual is also disqualified because of the impairment; and (3) the job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills, or abilities, within that geographical region, from which the individual is also disqualified because of the impairment. 29 C.F.R. § 1630.2(j)(3)(ii); *Ellison*, 85 F.3d at 190. To demonstrate that an impairment "substantially limits" the major life activity of working, an individual must show "significant[ ] restrict[ions] in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." 29 C.F.R. § 1630.2(j)(3)(i); *Pritchard,* 92 F.3d at 1133. The regulations specify that the "inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.*

Based upon the evidence in the record, we find that reasonable persons in the exercise of impartial judgment could not conclude that Gordon had a physical or mental impairment that substantially limited his ability to care for himself or to work. While the side effects that Gordon suffered as a consequence of his chemotherapy treatments may qualify as "physical impairments" under the ADA, we hold that such impairments did not substantially limit his ability to care for himself or to work.

The evidence demonstrates that except for a couple of days of medical testing and a leave of absence from June 18 until June 28, in which Gordon underwent the bone marrow biopsy, Gordon was fully capable of working. Gordon received a total of seven chemotherapy

treatments between June 25 and November 1. R2-48-22, 23. The treatments were performed on an outpatient basis, and Gordon was not hospitalized at any time during his treatment. R2-48-23, 24. Gordon stated that the side effects from the chemotherapy treatments lasted for approximately three days following a particular treatment session and that he handled them "fairly well." R5-80, 81. Moreover, Gordon's oncologist, Dr. Jadeja, specifically stated that Gordon was not disabled by the cancer and that he could continue to work. R2-48-16. In fact, Gordon himself conceded that he was fully capable of working. R5-88. Dr. Jadeja stated that from the date of Gordon's initial diagnosis with cancer, he was able to continue with his normal life activities, despite mild nausea that followed his chemotherapy treatments. R2-48-30. While Gordon did experience side effects from the chemotherapy treatments that he received every three weeks on friday afternoons, Dr. Jadeja observed that Gordon tolerated the treatments "quite well." R2-48-11, 24.

In light of this evidence, we find that the extent, duration, and impact of Gordon's chemotherapy treatment side effects on his ability to care for himself and to work reveal that these side effects did not substantially limit his ability to care for himself or to work. We, therefore, conclude that no conflict of substantial evidence exists as to whether Gordon's impairment substantially limited his ability to care for himself or to work. Consequently, we hold that while Gordon may have had a "physical impairment" as it is defined in the ADA, this impairment did not substantially limit his ability to care for himself or to work.

B. Regarded As Having An Impairment

Hamm also contends that Gordon failed to produce sufficient evidence to support the jury's finding that Hamm regarded him as being impaired. Gordon denies Hamm's contention and asserts that the evidence demonstrated that Hamm treated him differently following his return to work and that such treatment was due to his cancer. Specifically, he asserts that when he returned to work on July 8, he had been replaced by another worker, he was no longer assigned to air conditioning and heat ventilation repair work, he no longer had access to a company vehicle, and he was not re-issued a set of keys so that he could access various buildings at the project site. Accordingly, Gordon argues that sufficient evidence exists to support the jury's finding that Hamm regarded him as having a disability under the ADA.

The EEOC regulations define one who is "regarded as having such an impairment" as an individual who (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by her employer as constituting such limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) has no illness or malady defined by the EEOC as a physical or mental impairment but is treated by her employer as having a substantially limiting impairment. 29 C.F.R. § 1630.2(*l*); *Ellison,* 85 F.3d at 192. As with real impairments, courts have held that a perceived impairment must be substantially limiting and significant. *Ellison,* 85 F.3d at 192; *Wooten v. Farmland Foods,* 58 F.3d 382, 385 (8th Cir.1995);

*Byrne v. Board of Education,* 979 F.2d 560, 564 (7th Cir.1992).[3]   In this context, then, a significant impairment is one that is viewed by the employer as generally foreclosing the type of employment involved, not just a narrow range of job tasks.   *See* C.F.R. § 1630.2(j)(3);   *Ellison,* 85 F.3d at 192.

Moreover, courts have observed that the focus of these ADA provisions and regulations is on the impairment's effect upon the attitude of others.   *Wooten,* 58 F.3d at 385;   *Byrne,* 979 F.2d at 566.   These provisions and regulations are intended to combat the effects of archaic attitudes, erroneous perceptions, and myths that have the effect of disadvantaging persons with, or regarded as having, disabilities.   *Wooten,* 58 F.3d at 385 (citing *School Board of Nassau County v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)).   Consistent with this purpose of the subject provisions, Judge Posner has observed:

> [A]lthough at first glance peculiar, [this provision] actually makes a better fit with the elaborate preamble to the Act, in which people who have physical or mental impairments are compared to victims of racial and other invidious discrimination.   Many such impairments are not in fact disabling but are believed to be so, and the people having them may be denied employment or otherwise shunned as a consequence.   Such people, objectively capable of performing as well as the unimpaired, are analogous to capable workers discriminated against because of their skin color or some other vocationally irrelevant characteristic.

*Vande Zande v. State of Wisconsin Department of Administration,* 44 F.3d 538, 541 (7th Cir.1995).

---

[3]Although *Byrne* concerns a claim under the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.,* prior interpretations and constructions of the Rehabilitation Act are generally applicable in construing provisions of the ADA. *See Pritchard,* 92 F.3d at 1134;   *Wooten*, 58 F.3d at 385 n. 2; *Dutcher*, 53 F.3d at 727 n. 14.

In reviewing the evidence in the record in the light most favorable to Gordon, we conclude that such evidence is insufficient to support a finding that Hamm regarded Gordon as having a physical or mental impairment that substantially limited his ability to care for himself or to work.  Following his diagnosis with cancer, Gordon continued to perform the same or similar work that he had previously performed for Hamm at the Jacksonville project site. The evidence does show that during Gordon's absence from work Steve Shinn, another of Hamm's employees, performed much of the air conditioning repair work at the air station that Gordon customarily would have performed had he not been on medical leave.  However, because Gordon's absence occurred during a busy season for air conditioning repair work and because Gordon's absence resulted in Hamm's losing a significant part of its workforce, we conclude that it was reasonable for Hamm to assign such tasks to Shinn during Gordon's absence.  We find that it was entirely reasonable, if not necessary, for Hamm to make these types of adjustments in the work assignments, as work orders continued to come in and deadlines had to be met.  Gordon was absent for several days during a critical time period, and Hamm, thus, had to assign some of the work normally performed by Gordon to another employee.  Hamm's adjustments in no way support a finding that it regarded Gordon as having a physical impairment that substantially limited his ability to care for himself or to work.

Consistent with Hamm's adjustments to the work assignments during Gordon's absence, Hamm was unable to permit Gordon to engage exclusively in air conditioning and heat ventilation repair work

upon his return to work on July 8. In fact, the evidence shows that Gordon had performed these types of general maintenance repair projects prior to his diagnosis with cancer in May 1993. He never worked exclusively in the area of air conditioning and heat ventilation repair. The evidence demonstrates that Shinn continued to perform a great deal of this type of work after Gordon returned to work on July 8. However, we find this to be reasonable, as Shinn was still in the process of completing work projects previously assigned to him during Gordon's absence. Upon his return on July 8, Gordon was assigned that work which was then available, some of which was general maintenance-type work as opposed to specialized air conditioning and heat ventilation repair work. We conclude that these assignments in no way support a finding that Hamm regarded Gordon as having a physical impairment under the ADA which substantially limited his ability to care for himself or to work. We find that these assignments during the brief period from July 8 until July 16 merely reflected the types of work which Hamm then had pending for completion.

Gordon also argues that because the evidence demonstrates that he did not have access to a company vehicle and because Hamm did not re-issue him a set of keys after he returned to work on July 8, there is sufficient evidence in the record to support the jury's finding that Hamm regarded him as having an impairment under the ADA which substantially limited his ability to care for himself and to work. We find this argument to be without merit. The evidence reflects that Gordon continued to have access to a company vehicle and a set of keys at all times before and after his diagnosis with

cancer, except for the period extending from July 8 until July 16. From July 8 until July 16, the evidence does demonstrate that a company vehicle was not available for Gordon's use. Again, however, this fact does not support a finding that Hamm regarded Gordon as having a physical impairment that substantially limited his ability to care for himself or to work. Rather, the evidence shows that there were more employees than company vehicles. In addition, the evidence also demonstrates that Shinn and others already assigned to other jobs, including emergency duty, which required after-hour and weekend work, had access to these company vehicles because they had been previously assigned to the types of projects that required prompt and immediate attention.

As for the keys, the evidence in the record demonstrates that Gordon did have a set of keys prior to his taking medical leave. He used these keys to access various buildings and sheds at the air station. Gordon turned in these keys when he commenced his term of medical leave, and Shinn thereafter began using them during Gordon's absence. Because Van Horn failed to have a duplicate set of keys made and because Shinn needed these keys to complete the work projects that he had begun during Gordon's absence and to have emergency access to various buildings at the air station at night and on the weekends, Gordon did not have his own set of keys from July 8 until July 16. We hold once again, however, that this fact does not support a finding that Hamm regarded Gordon as having a physical impairment that substantially limited his ability to care for himself or to work. Van Horn simply failed to have an additional set of keys made once Gordon returned to work on July 8.

Our conclusion that Hamm did not regard Gordon as having an impairment that substantially limited his ability to care for himself or to work is further buttressed by the undisputed fact that Gordon never indicated to anyone at Hamm, before or after his diagnosis with cancer on May 27, 1993, that he was unable to perform the work assigned to him or that he was unable to care for himself. Although Bobby Davis had previously instructed Gordon to contact him if had any problems when he returned to work on July 8, Gordon never attempted to personally contact Mr. Davis about all of the alleged employment problems he had with Van Horn from July 8 until July 16. The record is totally devoid of any evidence which demonstrates that Gordon ever talked to anyone at Hamm about any difficulties he was having in completing any assigned tasks. Moreover, the undisputed evidence shows that after Gordon was diagnosed with cancer Hamm continued to provide Gordon with the same compensation and identical benefits as it had prior to his diagnosis with the disease. We, therefore, find that the evidence adduced at trial does not support the jury's finding that Hamm regarded Gordon has having a physical impairment which substantially limited his ability to care for himself or to work.

## V. *CONCLUSION*

Because we find that there was insufficient evidence adduced at trial to support the jury's finding that Gordon had a physical or mental impairment that substantially limited one or more of his major life activities or that he was regarded by Hamm as having such an impairment, we conclude that the district court erred in denying Hamm's renewed motion for judgment as a matter of law on

the ADA claim.  We hold that Gordon did not have a disability under the ADA. Accordingly, he is not entitled to the Act's protections.

The judgment of the district court is, therefore, REVERSED, and the matter is REMANDED to the district court so that it may enter judgment for Hamm on the ADA claim.