**Milton BIVINS, Plaintiff,**

v.

**BRUNO'S, INC., et al., Defendants.**

**No. 5:95–cv–400–4 (WDO).**

United States District Court,
M.D. Georgia,
Macon Division.

Feb. 10, 1997.

John A. Draughon, Russell M. Boston, Macon, GA, for Milton Bivins, Jr.

Stanford Glenn Wilson, Victor J. Maya, Atlanta, GA, for Bruno's, Incorporated, Piggly Wiggly Southern, Inc., Bruno's Food Stores, Inc.

### ORDER

OWENS, District Judge.

Before the court is defendants' motion for summary judgment on plaintiff's claims

brought under the Americans with Disabilities Act ("ADA"). After carefully considering the arguments of counsel, the relevant case law and the record as a whole, the court issues the following order.

### FACTS

Milton Bivins began working for a Piggly Wiggly grocery store[1] in Macon, Georgia as a part time bag clerk on January 7, 1974. After a number of raises, he was promoted to the position of frozen foods clerk in 1989, where he remained until his termination in 1993.

The frozen foods clerk position[2] consists of unloading grocery boxes onto pallets, pushing or pulling the pallets to the appropriate aisle in the store, and unloading the individual items from the boxes onto the shelves. The pallets are on wheels, and often weigh up to 1,800 pounds each. Most of the items clerks have to lift and carry weigh under ten pounds. However, clerks frequently have to carry items weighing 10–25 pounds, and occasionally items weighing 25–50 pounds. The heaviest items in the frozen foods section are large bags of ice, which weigh 42–48 pounds but can be broken up into individual six-eight pound bags. Sometimes the clerks first "break down" a pallet into smaller components to make moving the items through the store easier. Finally, clerks spend approximately 7% of their time reaching above their head (Colley, On–Site Analysis conducted June 19, 1996, at 2–4).

Bivins began having problems with his neck after a case of Coffeemate fell onto his head on October 6, 1986. Between 1986 and 1988 Bivins took three separate leaves of absence due to problems with his neck, for a total of approximately eight months' absence.

In August 1988 Bivins underwent surgery to fuse joints in his neck and back. A few months after the surgery, Bivins had recovered enough to return to his job as a frozen foods clerk, where he worked without problem for about eighteen months. Then in September of 1991, Bivins reinjured his neck while attempting to pull a pallet loaded with groceries. Dr. William B. Dasher examined Bivins and recommended a second fusion surgery which was performed on December 18, 1992. After the surgery, Bivins had to wear a brace which severely restricted his ability to move his neck. Thus, Bivins began his fourth leave of absence on December 18, and Dr. Dasher did not give him a release to return to work in any capacity until the following September.

On September 21, 1993, Dr. Dasher released Bivins to return to work in a light duty capacity. Dasher's release stated that because of the restricted movement of his neck and head, Bivins could not do repetitive overhead lifting, and could not do any heavy lifting (defined as anything over ten pounds), pushing or pulling of heavy objects, or driving (Dasher, Exh. # 8). The day after he obtained the release, Bivins went with Ms. Gayle Colley, the Certified Rehabilitation Supplier assigned to him under the Georgia workers compensation statute, to speak with the store manager, Danny Mathews, about returning to work. Mathews told Bivins he could not allow him to return without the approval of the Bruno's Birmingham headquarters. Ms. Colley later called Mathews back and was told that Bill Webster, a human resources manager in the Birmingham office, had decided to not to allow Bivins to return to work because of the ten-pound weight restriction (Mathews, at 61–63, 66).

1. Since 1987, the Piggly Wiggly store has been owned and operated by the parent company Bruno's, Inc. ("Bruno's"), which has a headquarters office in Birmingham, Alabama.

2. While Bruno's did not use written job descriptions, testimony shows that the positions of frozen foods clerk, stock clerk and grocery clerk all consist of the same duties and require the same qualifications (Mathews, at 94). Much of the evidence attempting to describe the duties and qualifications of the stock clerk position was in the form of job analysis reports prepared by Ms.

Gayle Colley, plaintiff's Rehabilitation Supervisor under the Georgia workers compensation statute. The court finds Ms. Colley's reports to be thorough and precise and has no reason to doubt their accuracy. Ms. Colley's reports were prepared largely from her own observations and descriptions from actual clerks, and so are in substantial agreement with the descriptions given by the employees. Unless otherwise noted, the court has drawn the facts regarding the requirements of the clerk positions from Ms. Colley's reports.

Ms. Colley was told that the company was afraid Bivins would reinjure himself and would prefer to wait until Bivins had fully recovered before letting him return to work (Colley, at 237).

Ms. Colley continued to press Mathews to let Bivins begin working again as soon as possible, and discussed with him possible ways to modify Bivins' job duties to allow him to perform as much of the job as possible with his restrictions. According to her studies, with the ten-pound restriction in place at that time, Bivins would not have been able to unload stock from trucks and pallets or bring stock from the back of the store to the aisles. She also felt that the heavy 42–48 pound bags of ice would be a problem for Bivins unless they were first broken down into the individual 6–8 pound bags. Finally, Bivins would not have been able to safely reach the top shelf in the frozen foods department, which accounted for approximately 10% of the area to be stocked. Ms. Colley later testified that in her judgment, Bivins—with accommodations in the form of help from co-workers in moving all heavy items and breaking down large components into manageable individual packages—would have been able to perform approximately 50% of his job duties (Colley, at 110).

Piggly Wiggly had a routine policy of terminating any employee who took a leave of absence over one year. Pursuant to this policy, on December 20, 1993, Bivins received a termination letter permanently dismissing him from his job for failing to report to work within a year. The store manager Mathews encouraged Bivins to reapply, but his application for a stock clerk position was denied on February 20, 1994, due to a lack of vacancies in that position.

Plaintiff filed suit alleging that his termination and Bruno's failure to rehire him violated the ADA.

## DISCUSSION

### I. Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be entered in favor of the movant where the entire record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The court examines the substantive law involved to determine which facts are material, and all reasonable doubts regarding facts are resolved in favor of the nonmoving party. *Irby v. Bittick,* 44 F.3d 949, 953 (11th Cir. 1995).

The movant is entitled to judgment as a matter of law when the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once a party has properly supported its motion for summary judgment, the burden shifts to the nonmovant to create, through significantly probative evidence, genuine issues of material fact necessitating a trial. *Id.* at 324, 106 S.Ct. at 2553.

### II. ADA Context

The ADA provides that a covered employer shall not discriminate against a qualified individual with a disability in relation to employment decisions. 42 U.S.C. § 12112(a). Although the Eleventh Circuit has not explicitly held so, it is widely agreed that the burden-shifting analysis laid out in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and applied to Title VII cases is similarly followed in deciding claims brought under the ADA. *See Moses v. American Nonwovens, Inc.,* 97 F.3d 446, 447 (11th Cir.1996) (implicitly using burden-shifting framework); *McNemar v. The Disney Store, Inc.,* 91 F.3d 610, 619 (3d Cir.1996); *Rizzo v. Children's World Learning Centers, Inc.,* 84 F.3d 758, 761 n. 2 (5th Cir.1996); *see also Johnson v. Boardman Petroleum, Inc.,* 923 F.Supp. 1563 (S.D.Ga.1996); *Lewis v. Zilog, Inc.,* 908 F.Supp. 931 (N.D.Ga.1995). Thus, once plaintiff has established a prima facie case, the burden shifts to the defendant to give legitimate, non-discriminatory reasons for the decision. Once that is done, unless the plaintiff creates a genuine issue of material fact as to whether the proffered reasons are pretextual, the defendant is entitled to summary judgment. Throughout the litigation,

the plaintiff bears the ultimate burden of proving that he was the victim of discrimination. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 509–511, 113 S.Ct. 2742, 2748–49, 125 L.Ed.2d 407 (1993).

In order to establish a prima facie case under the ADA, a plaintiff must show that (1) he has a disability; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination as a result of his disability. *Gordon v. E.L. Hamm & Assoc., Inc.,* 100 F.3d 907, 910 (11th Cir.1996). A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* at 911 (quoting 42 U.S.C. § 12111(8)). Consideration is given to the employer's judgment as to what functions of a job are essential. 42 U.S.C. § 12111(8).

"Discriminate" is defined in the ADA context as "not making reasonable accommodations . . . to an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." *Harris v. H & W Contracting Company,* 102 F.3d 516 (11th Cir.1996) (quoting 42 U.S.C.A. § 12112(b)(5)(A) (West 1995)). "Undue hardship" is defined as an action requiring significant difficulty or expense, when considered in light of factors including the nature and cost of the accommodation to the employer and the affect of the accommodation on the employer's operations. 42 U.S.C. § 12111(10).[3] The employee at all times retains the burden of persuasion as to whether reasonable accommodations were available at the time the complained of action occurred. *Moses,* 97 F.3d at 447.

### III. Claims Under the ADA

█ In order to have a discrimination claim, there must first be an adverse employment decision of some kind.[4] At first blush, it may appear that in this case there are only two actions by Bruno's that might qualify as adverse employment decisions: the termination of and failure to rehire Bivins. However, there is a third candidate that better highlights the real problem in this case—the refusal to allow Bivins to return to work once he was given the release to perform in a light duty capacity. Although plaintiff has not made this precise argument, the court finds that the refusal to let Bivins work in September 1993 was one adverse employment decision, and the termination in December 1993, although the inevitable result of that refusal, constitutes a separate and distinct adverse employment decision. Of these three employment decisions, the refusal to allow Bivins to work with the light duty restriction is the one most obviously associated with Bivins' impairment, and therefore the one most likely to establish a winning claim under the ADA.

█ However, this does not complete Bivins' prima facie case. Bivins must show not only that he was the victim of an adverse employment decision, but that the decision deprived him of a job for which he was qualified with or without an accommodation. This he cannot do. The impairment under which he suffered was clearly highly detrimental to his ability to perform his job. In-

---

3. The court notes that the definitions cited are impossibly circular and provide little helpful guidance to employers trying to decide what the ADA requires in the way of accommodation.

4. Of course, the threshhold issue, and one the parties spent a good deal of their briefs arguing, is whether Bivins' impairment sufficiently limited one or more of his major life activities to constitute a disability under the ADA. Defendant argues that plaintiff's impairment does not constitute a disability, and points to two cases from other jurisdictions holding that 25–pound lifting restrictions did not constitute a disability. *See Williams v. Channel Master Satellite Systems,*

*Inc.,* 101 F.3d 346, 349 (4th Cir.1996); *Aucutt v. Six Flags Over Mid–America,* 85 F.3d 1311, 1319 (8th Cir.1996).

The impairment here is more restrictive than the impairments referenced in those cases, and was accompanied by other restrictions on Bivins' ability to move and reach. As such, the court is unwilling at this point to hold that as a matter of law a restriction against lifting anything over ten pounds cannot constitute a disability. Moreover, in light of the rulings set forth below, the court need not decide the issue of whether Bivins suffered from a disability in disposing of this motion.

deed, Gayle Colley, the person charged with helping him get back to work, admitted that even with the accommodation of help from other co-workers to lift any items over ten pounds and stock the overhead shelves, Bivins would only have been able to perform about 50% of the duties of stock clerk. Given these facts, the court is persuaded that Bivins was not able to perform the essential functions of the position at the time of his initial release in September 1993, and therefore did not fall within the definition of "qualified individual."

■ Moreover, all of this hinges on the erroneous assumption that the accommodation of having other employees do the "heavy lifting" for Bivins was "reasonable". The employer's duty to provide reasonable accommodation must end long before the reasonable accommodation required becomes another employee to do the disabled employee's job. *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1125 (10th Cir.1995) (holding that grocery store employer was not required to change employee's duties in such a way that other employees would have to work harder or longer hours in order to reasonably accommodate employee's disability); *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1112–13 (8th Cir.1995) (holding that employer need not reallocate essential functions of job to make reasonable accommodation). The ADA was intended to prevent discrimination against people who could perform the job with a not unduly burdensome accommodation of their disability. *See generally* 42 U.S.C. § 12101(b). It was not intended to force the employer to subsidize disabled people by keeping them in their paid positions while still having to hire someone else to actually do their jobs.

While Bivins could surely have performed some aspects of the stock clerk job, it is clear that a good many others he could not per-

form at that time. Plaintiff's argument that he could have handled the job with a step stool and help from other stock clerks for the heavy items—defined as anything over ten pounds—only begs the question. A nurse can do the job of a neurosurgeon if given a little "help" with the more technical aspects of diagnosis and surgery. The analogy may tend to the extreme, but the principle at stake is identical: *anyone* can do *anything* with "help" from another person who does all the difficult parts of the job for you. The inescapable fact is that a stock clerk position consists almost entirely of lifting, reaching, carrying, pushing and pulling items, some of which are heavy and some of which are not. Bivins simply could not do a lot of this type of activity at the time.[5]

It would be perverse to force employers to keep people in jobs that include a large number of duties the employees can no longer perform without help. The court finds that Bivins was not qualified for the job of stock clerk or frozen foods clerk in September 1993, and Bruno's was under no duty to allow him back to work at that time, as there was no "reasonable" accommodation that would have allowed Bivins to perform the duties of the job. Accordingly, plaintiff has failed to state a prima facie case with regard to the decision not to allow him to return to work.

The other two adverse employment decisions fail not only because Bivins was not qualified for the job, and therefore cannot make out a prima facie case, but also for other reasons precluding relief under the ADA. His termination in December 1993 for not reporting to work within a year was a non-discriminatory exercise of existing administrative company policy. Plaintiff has not presented any evidence showing that Bivins was singled out for termination on

---

**5.** As plaintiff spends a good deal of time in his briefs pointing out, it is undoubtedly true that most if not all of the items moved by stock clerks can be broken down into smaller components moveable by even the smallest child or the weakest patient; the individual packages of any product rarely weigh enough to be measured in pounds at all. But the job of stock clerk requires some degree of efficiency—the employee simply must be able to move a box or so of product at a

time. Just having boxes put in front of him and taking out one package at a time and putting it on the shelf may qualify someone to be a "shelver", but does not necessarily qualify him to be a stock clerk. No amount of evidence showing that individual packages of corn weigh 8–9 ounces and individual packets of lima beans weigh 12–15 ounces can change that fact (Mason, at 8–16).

account of his impairment. Likewise, the subsequent failure to rehire Bivins was on account of a lack of vacancies in the applied for position of stock clerk. Plaintiff has not presented any evidence supporting the allegation that these reasons were pretextual.

Therefore, the court finds that even if plaintiff had satisfied the burden of presenting a prima facie case, defendant has provided legitimate, non-discriminatory reasons for the adverse employment decisions related to these claims sufficient to entitle it to summary judgment as to both. *Pritchard v. Southern Company Services*, 92 F.3d 1130, 1134–35 (11th Cir.1996) (holding that in order to survive motion for summary judgment, plaintiff must present sufficient evidence to allow a reasonable factfinder to conclude that the proffered legitimate, non-discriminatory reason for discharge is not believable).[6]

## CONCLUSION

Having carefully considered the matter, defendant's motion for summary judgment is **GRANTED** as to all claims, and the case is **DISMISSED**.

---

6. The evidence of a subsequent offer by Bruno's to Bivins for a stock clerk job in no way shows that Bruno's discriminated against him when it failed to rehire him in February 1994. Furthermore, it is important to note that the important considerations for the court to consider are the company's actions at the time of the alleged adverse employment decisions. It is irrelevant that the restrictions on plaintiff's movements were subsequently lessened to allow plaintiff to lift up to 50 pounds. That was unforeseeable at the time of the decisions, and there was no indication that Dr. Dasher considered the impairment to be temporary at the time.