**Linda F. HILBURN, Plaintiff,**

v.

**MURATA ELECTRONICS NORTH AMERICA, INC. f/d/b/a Murata Erie North America, Inc., Defendant.**

No. Civ.A.1:96CV3147–ODE.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 16, 1998.

William Q. Bird, Karin L. Allen, William Q. Bird & Associates, Atlanta, GA, for Plaintiff.

Stephen William Riddell, John Shiver Snelling, Troutman Sanders, Atlanta, GA, for Defendant.

## ORDER

ORINDA D. EVANS, District Judge.

This civil action, in which Plaintiff seeks declaratory and injunctive relief as well as compensatory damages under the Americans with Disabilities Act of 1990, as amended, ("ADA"), 42 U.S.C. §§ 12101–12213, is before the court on Defendant's opposed motion for summary judgment.[1]

Defendant manufactures, distributes and sells electronic components used in consumer

---

1. Plaintiff originally asserted a Title VII claim of sex discrimination as Count II of her complaint;

electronic products. Defendant maintains corporate headquarters in Smyrna, Georgia with its parent company and principal supplier in Japan. Most of Defendant's products are manufactured or processed at a large facility in State College, Pennsylvania; however, Defendant maintains a small processing facility in Rockmart, Georgia where it operates a production line which processes tiny ceramic chips by attaching a conductor wire that allows the chips to be installed in electronic board circuits. Plaintiff was hired to work as a machine operator for Murata Electronics North America, Inc. ("Defendant") in its Rockmart plant on February 28, 1976. At the time the following events occurred, Plaintiff was working as a Material Control Coordinator. Her responsibilities included receiving customer orders and monitoring inventory.

The facts are undisputed except as otherwise noted. On June 2, 1988 Plaintiff's son was diagnosed with brain stem Astrocytoma, a brain stem tumor. He received chemotherapy and radiation therapy. Several months later, Plaintiff's husband was diagnosed with Acute Pancreatitis and was forced to have a portion of his pancreas removed. As a result of medical treatments, Plaintiff's husband suffers from diabetes. Between June 2, 1988 and February 1989, Plaintiff was not at work for all or part of 100 days. In October 1989, Plaintiff suffered a myocardial infarction. Plaintiff missed all or part of 38 days between October and December of 1989.

Defendant has an attendance policy and a general corporate policy which provided a limited number of paid sick days and the option for discretionary leaves of absence. The policy further provided that Defendant could discipline an employee with more than five absences during any six month period and to consider an employee's attendance record for the purposes of transfer, promotion and pay increases.[2] Plaintiff missed 14 days in 1990, 13 days in 1991, and 15 days in 1992, with a total of 180 days missed between 1988 and 1992. Plaintiff was not disciplined as a result of her absences.

Plaintiff returned to work and was able to perform her duties. No special accommodation was sought or was granted. Plaintiff states that her Doctor told her not to lift over ten pounds and "[t]hat's the only thing I've been told I can't do." [Hilburn Depo. at 56]. According to Plaintiff, her son now wears bilateral hearing aids as a result of some hearing loss, and he has some memory and learning problems.[3] Plaintiff states that her son is not able to play contact sports or ride certain amusement park rides. Plaintiff states that her husband, a Captain in a police department, has a fifteen pound lifting restriction and cannot fight or be kicked. [Id. at 49].

On January 4, 1993, Plaintiff applied for a transfer to the position of Material Control Expediter at the Smyrna location. Plaintiff's Supervisor, Fred Smith, ("Smith") recommended Plaintiff for the job; however, Smith noted his concern over Plaintiff's attendance stating: "Illness and sickness to herself and family members have caused her to be out from her job." [Plaintiff's motion for summary judgment Exhibit E]. Taku Katayama [Katayama], the Smyrna supervisor in charge of hiring for the open position, never received Smith's recommendation. Katayama was approached by Bob Entrekin, Vice President for Human Resources, and was informed that Plaintiff "had attendance problems." [Katayama Depo at 21]. Katayama chose another woman for the position with a college degree. Defendant has stated that it did not promote Plaintiff because she did not have a college degree,[4] that the individual

---

however, Plaintiff made a motion to voluntarily dismiss her sex discrimination claim which was granted on December 30, 1997.

**2.** Plaintiff acknowledged receipt of the handbook of policies in her Deposition. [at 26].

**3.** Plaintiff's son has been diagnosed with Attention Deficit Disorder and is enrolled in special education classes at his local public school.

**4.** Defendant states that while a college degree was not expressly included as a requirement in the job posting, it had been "striving" to hire

selected had direct experience performing the jobs in question, and Plaintiff had a history of attendance problems.

On March 11, 1993, Plaintiff applied for a transfer to an open position in customer service at the Smyrna office. Smith again recommended Plaintiff for the position and he expressed his concerns over her attendance as well. Defendant hired another individual with a college degree.

Between 1992 and March 1993, Defendant instituted a corporate downsizing effort at the Rockmart facility as a result of a decrease in customer orders. On March 26, 1993, Plaintiff received official notice from Defendant that she was being placed on "layoff," in addition to three other non-production employees. Plaintiff's responsibilities were divided among three existing employees. As a result of this effort to reduce its force, Defendant laid off twenty-six (26) of the fifty-two (52) non-production employees.

After approximately two months, a temporary position in Defendant's Product Support Group became available. Plaintiff was issued a recall for this position on May 14, 1993.[5] Plaintiff accepted and worked in the capacity of Literary Fulfillment Clerk in the production department from May 14 until June 24, 1993. In June 1993, while working in the temporary position, Plaintiff applied for a transfer to another open position as a Material Control Expediter at Defendant's Smyrna office. Plaintiff's supervisor at that time, Mary Akin, ("Akin") recommended Plaintiff for the position. Defendant hired another individual with a college degree for this position.

Plaintiff secured employment as a medical secretary for a trial period with the Floyd County Medical Center. On August 30, 1993, Plaintiff filed a charge of discrimination with the EEOC based on her sex and disability or her association with immediate family members with disabilities.

Plaintiff was later called about an open position in the Rockmart facility warehouse as a result of Defendant's layoff and recall policy. Plaintiff declined the position and the opportunity to interview.[6] On January 10, 1994, Akin contacted Plaintiff about an open position in Defendant's Production Control Department as a Product coordinator. Plaintiff declined to interview for this position as well, because she had already secured full-time work at the Floyd County Medical Center. As a result of Plaintiff declining the interview, she waived her recall rights. Defendant sent Plaintiff a letter terminating her employment the following day.

Plaintiff received her Right to Sue letter from the EEOC on August 30, 1996, and commenced the instant action on November 27, 1996. Plaintiff contends that she was not promoted, laid off, and not rehired as a result of her disability and because of her association with individuals with disabilities, her son and husband, in violation of the ADA.

The court will grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 254, 106 S.Ct. 2505, 2510, 2513, 91 L.Ed.2d 202 (1986). Under Fed.R.Civ.P. 56(c), summary judgment is mandated against a party who, after adequate discovery, "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). While the evidence and factual inferences are

---

employees with college degrees as they were better candidates for future promotions.

**5.** Defendant has a policy of issuing callbacks to employees on temporary layoff, which permitted employees on layoff to interview for any positions for which they were qualified that became open within one year after their layoff.

**6.** It is undisputed that it is Defendant's policy that when an employee on layoff rejects an interview for an open position, that individual loses her recall rights. However, the individual offering Plaintiff the position assured Plaintiff that in turning down the warehouse position she would not lose her recall rights.

to be viewed in a light most favorable to the non-moving party, *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1529 (11th Cir.1987), the non-moving party is required to do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

With respect to count one of Plaintiff's complaint, in enacting the ADA, Congress made it unlawful for a covered entity to discriminate "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Under 42 U.S.C. § 12112(b)(5)(A), the term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or an employee...."

To establish a prima facie case of unlawful disability discrimination, a plaintiff must show that: 1) she is disabled; 2) she is otherwise qualified for the position; and 3) she was subjected to unlawful discrimination because of her disability. *Morisky v. Broward County,* 80 F.3d 445, 447–49 (11th Cir. 1996). In addition, a Plaintiff must demonstrate that the employer had either actual or constructive knowledge of the disability or considered the employee to be disabled. *Id.* at 448. A "qualified individual with a disability" is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

In the ADA, Congress has defined "disability" as a(1) physical or mental impairment that substantially limits one or more of the major life activities of an individual; (2) a record of such impairment; or (3) being regarded as having such impairment. 42 U.S.C. § 12102(2). An individual is deemed to be "disabled" for purposes of the ADA if he satisfies any one of these three enumerated definitions. A physical impairment, standing alone, however, is not necessarily a disability as contemplated by the ADA. *Pritchard v. Southern Company Services,* 92 F.3d at 1132. The ADA requires that the impairment substantially limit one or more of the individual's major life activities. *Id.*

■ Plaintiff first contends that she is disabled for purposes of the ADA, in that she suffers from a physical or mental impairment that substantially limits one or more of her major life activities. Plaintiff suffered a Myocardial infarction in 1989. In her deposition Plaintiff states that her only limitation is that of a ten pound lifting restriction. Plaintiff contends that she suffers a diminished activity tolerance for normal daily activities such as lifting, running and performing manual tasks. Plaintiff cites *Frix v. Florida Tile Industries, Inc.,* 970 F.Supp. 1027 (N.D.Ga. 1997) for the proposition that Plaintiff's lifting restriction prohibits her from performing an entire class of jobs. In *Frix,* the plaintiff's job description included lifting packages weighing in excess of 45 pounds. The plaintiff was injured on the job when he lifted a part weighing about 100 pounds. The plaintiff was restricted from lifting more than 20 pounds. The court found the plaintiff's back impairment prevented him from performing an entire class of jobs, which rendered him " 'substantially limited in the major life activity of working because the individual's impairment eliminates his or her ability to perform a class of jobs.' " *Id.* at 1034, *quoting,* 29 C.F.R. pt. § 1630. A "class of jobs" is defined as:

> The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment.

29 C.F.R. § 1630.2(j)(3)(ii)(B); 138 F.3d 1366, 1370.

■ Plaintiff states in her brief that, "since Plaintiff's disability prohibited her from performing an entire class of jobs, she has a disability within the meaning of the ADA." [at 19]. The facts in *Frix* are markedly different from those of the case at bar. A mere assertion of diminished capacity does not constitute a disability under the ADA. The ADA requires that the impairment substantially limit one or more of the individual's major life activities. *Pritchard v. Southern Company Services*, 92 F.3d at 1132. "Major life activities" is defined as: "Functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Plaintiff has offered no evidence that her lifting restriction or her "diminished capacity for normal daily activities" has limited in any way her major life activities.[7] In fact, in her deposition, Plaintiff states that her Doctor told her not to lift over ten pounds and "That's the only thing I've been told I can't do." [Hilburn Depo. at 56]. Plaintiff must do more than just assert that she is disabled. "Although a plaintiff seeking recovery under the ADA is not required to provide a comprehensive list of jobs which she cannot perform, the person must provide some evidence beyond the mere existence and impact of a physical impairment to survive summary judgment." *Swain v. Hillsborough County School Bd.*, 146 F.3d 855, 858 (11th Cir.1998). Plaintiff has not presented any evidence to support her contention. Additionally, Plaintiff's "own testimony and employment record belie any claim that she cannot perform a broad range or class of jobs that individuals of similar skill, ability, and training can perform." *Id.* Plaintiff has proffered insufficient material facts to establish that she in fact suffers from a disability as contemplated by the ADA.

■ Second, Plaintiff contends that she is disabled for purposes of the ADA because Defendant had a record of her impairment as Defendant approved paid medical leaves of absence for her. The EEOC has defined "a record of such impairment" to be, "a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k) (1996). Plaintiff has not furnished any evidence that there was a record of a mental or physical impairment that substantially limits one or more of Plaintiff's major life activities. There is no documentation that Plaintiff has a history of a physical impairment or that she has been classified as such. Merely because Defendant approved medical leaves of absence for Plaintiff as a result of her son's and husband's illnesses in 1988 and for Plaintiff in 1989 as a result of her heart attack, establishes neither a history of, nor a misclassification of, Plaintiff suffering from a physical impairment limiting one or more of her major life activities. As such, Plaintiff has not established a record of impairment under the ADA as defined by the EEOC.

■ Third, Plaintiff contends that Defendant regarded her as suffering from a disability. The EEOC regulations define one who is "regarded as having such an impairment" as an individual who (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by her employer as constituting such limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) has no illness or malady defined by the EEOC as a physical or mental impairment but is treated by her employer as having a substantially limiting impairment. 29 C.F.R. § 1630.2(1). As with real impairments, a perceived impairment must be substantially limiting and significant. In this context, then, a significant impairment is one that is viewed by the

---

**7.** While the Eleventh Circuit has not yet addressed the issue of a lifting restriction as constituting a disability, several other circuits have addressed this very issue and have held that a lifting restriction alone did not constitute a significant restriction on one's ability to work, lift or perform any other major life activity. *Aucutt v. Six Flags Over Mid-America*, 85 F.3d 1311, 1319 (8th Cir.1996); *Ray v. Glidden Co.*, 85 F.3d 227, 228 (5th Cir.1996); *Williams v. Channel Master Satellite Sys., Inc.*, 101 F.3d 346 (4th Cir.1996).

employer as generally foreclosing the type of employment involved, not just a narrow range of job tasks. *Gordon v. E.L. Hamm & Associates, Inc.,* 100 F.3d 907, 913 (11th Cir. 1996).

Plaintiff has not proffered any evidence that Defendant treated her as if she suffered from a substantially limiting impairment. The mere fact that Plaintiff was perceived as an attendance problem in light of the fact that she missed, on average, 14.5 days a year for the years 1990–1992, and 180 days for the years 1988–1992 does not indicate that Defendant perceived Plaintiff as suffering from a limiting disability. Moreover, just as in *Gordon* where the court found that the plaintiff was not regarded as having a disability, Plaintiff in the instant action "continued to perform the same or similar work that [she] had previously performed" prior to her heart attack. *Id.* at 913. Plaintiff has offered insufficient evidence that she was suffering from a disability, had a record of such impairment or was perceived to be suffering from a disability. As Plaintiff is not "disabled" as defined by the ADA, this court need not determine if Plaintiff satisfied the remaining elements of her prima facie case.

■■■ The court next turns to Plaintiff's contention that she was discriminated against as a result of her association with individuals with a disability, her son and her husband. In order to establish a prima facie case of "association discrimination" under ADA § 102(b)(4), 42 U.S.C. § 12112(b)(4), a plaintiff must demonstrate the following: (1) the plaintiff was "qualified" for the job at the time of the adverse employment action; (2) the plaintiff was subjected to adverse employment action; (3) the plaintiff was known by his employer at the time to have a relative or associate with a disability; (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision. *Hartog v. Wasatch Academy,* 129 F.3d 1076, 1085 (10th Cir.1997). If the plaintiff in

an ADA "association discrimination" case can establish these four elements, then the familiar *McDonnell Douglas* burden shifting is implemented.

■■■ Section 102(b)(4) further defines "discriminate" to include:

> excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association.

42 U.S.C. § 12112(b)(4) (1994). A family relationship is the paradigmatic example of a "relationship" under the association provision of the ADA.[8] *Hartog* at 1082. The provision was enacted in response to a situation where a woman was fired from her job because her son, who was sick with AIDS, moved into her home so she could care for him. The 10th Circuit in *Hartog* outlined the parameters of the association provision as discussed in the legislative history:

> [A]ssume, for example that an applicant applies for a job and discloses to the employer that his or her spouse has a disability. The employer believes the applicant is qualified for the job. The employer, however, assuming without foundation that the applicant will have to miss work or frequently leave work early or both, in order to care for his or her spouse, declines to hire the individual for such reasons. Such a refusal is prohibited by this subparagraph.

> In contrast, assume that the employer hires the applicant. If he or she violates a neutral employer policy concerning attendance or tardiness, he or she may be dismissed even if the reason for the absence or tardiness is to care for the spouse. The employer need not provide any accommodation to the nondisabled employee. The individuals covered under this section are any individuals who are discriminated against because of their known association with an individual with a disability.

---

8. The Eleventh Circuit has not yet addressed the association provision of the ADA

*Hartog* at 1082, *quoting,* H.R.Rep. No. 101–485, pt. 2, at 61–62 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 343–44.

In a floor debate held subsequent to the publication of these two reports, Congressman Bartlett, a sponsor of the bill, stated that the:

> terminating employee would have to prove that the employer knew of the association and was terminating the employee because of that association, and not because he or she was otherwise [un]qualified.

*Id.*

 In *Tyndall v. National Educ. Ctrs., Inc.,* 31 F.3d 209 (4th Cir.1994), for example, an employee was terminated because she missed work repeatedly and extensively primarily to care for her disabled son. The terminated employee sued, alleging association discrimination; however, the court rejected the plaintiff's claim. *Id.* at 214. "If [a non-disabled employee] violates a neutral employer policy concerning attendance or tardiness, he or she may be dismissed even if the reason for the absence or tardiness is to care for the [disabled associate]." *Hartog v. Wasatch Academy,* 129 F.3d 1076, 1083 (10th Cir.1997), *quoting,* H.R.Rep. No. 101–485, pt. 2, at 61–62 (1990).

Plaintiff has not shown that she was in fact qualified for the positions she requested. Defendant has stated that it did not promote Plaintiff because she did not have a college degree and therefore did not have as much potential for future promotions as the individuals selected, that the individuals selected had direct experience performing the jobs in question, and Plaintiff had a history of attendance problems. While Defendant did not discipline Plaintiff as a result of her

absences, Plaintiff knew of the attendance policy and her lack of attendance alone properly rendered her unqualified for a promotion which required more responsibility. *Jackson v. Veterans Administration,* 22 F.3d 277, 279 (11th Cir.1994).

Plaintiff has offered insufficient evidence that she was not promoted and was laid off as a result of her association with individuals with a disability. While Plaintiff has not established that her son and husband are disabled for purposes of the third prong of the association provision, even assuming arguendo that they are disabled, Plaintiff has not met her burden of proving that Defendant did not promote her to the Smyrna office, laid her off, and did not rehire her[9] because of that association, and not because she was otherwise unqualified. The case at bar falls squarely within the second scenario foreseen by the drafters of this legislation. Plaintiff violated Defendant's neutral policy concerning attendance and did not possess a college degree, and therefore, was properly rendered unqualified.

Accordingly, Defendant's motion for summary judgment [# 24] is hereby GRANTED.

SO ORDERED.

---

**9.** It is undisputed that Plaintiff was terminated because she did not exercise her option to inter- view under Defendant's recall policy.