**Sheila F. MEARS and Luther B. Mears, Jr., Plaintiffs,**

v.

**GULFSTREAM AEROSPACE CORP., Defendant.**

Civ. A. No. 494–217.

United States District Court, S.D. Georgia, Savannah Division.

Sept. 5, 1995.

Fred Stephen Clark, Savannah, GA, for plaintiffs.

Stanford A. Hines, Sage Brown & Associates, Savannah, GA, for defendant.

### *ORDER*

EDENFIELD, Chief Judge.

Plaintiffs Luther B. and Sheila F. Mears brought suit against Gulfstream Aerospace Corporation for discrimination against Sheila on the basis of a disability and for Luther's resulting loss of consortium. The Plaintiffs also sought recovery under 42 U.S.C. Section 1983. Luther Mears' loss of consortium claim was dismissed, and Plaintiff withdrew her Section 1983 claim at the status conference. Sheila Mears' discrimination claim is the sole remaining cause of action. Defendant moves for summary judgment, arguing that, under the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. (1991), there is no reasonable accommodation it can give Plaintiff which would afford her the opportunity to perform the essential functions of her job. The Court **GRANTS** Defendant's motion for summary judgment.

## I. Background

Sheila Mears began working in Gulfstream's accounts receivable department in 1983. Her employment at Gulfstream was uneventful until 1987 or 1988 when a male employee made a sexually harassing remark to her. S. Mears Dep. at 38–43. Sheila was upset by this event, and reported it to upper management. The male employee was required to apologize for the incident and was formally reprimanded. *Id.* Other male employees, including her supervisor, made other comments which she construed as sexually offensive. S. Mears Dep. at 109. Another incident involved some female employees in her department placing an article on her desk about breast implants, apparently to ridicule her about "being very small chested." *Id.* at 108–16. Plaintiff never filed a grievance about any of these incidents. *Id.* at 117.

Another incident unrelated to any sexual harassment occurred in October of 1992. Plaintiff, after a night in which she got little sleep and while she was suffering from a migraine headache, dropped some files on her desk. S. Mears Dep. at 25–30. Her supervisor, Harold Smith, called her into his office and accused her of taking drugs. *Id.* Smith demanded that Sheila take a drug test and, along with one of her fellow employees, escorted her to the nurse's station for the drug test. *Id.* at 27. Plaintiff was humiliated by this experience. *Id.* at 136. Her drug test came back positive for a minor substance, and Sheila admitted to taking a "nerve" pill she had gotten from her grandmother. *Id.* at 49.

Company policy required anyone testing positive for any drug to see a doctor affiliated with the company. The doctor told her she suffered from a lack of self confidence. *Id.* at 48.

When Plaintiff asked Smith for an explanation for the incident, he began pounding his fist on his desk and was, in Plaintiff's opinion, extremely upset with her. *Id.* at 43–44. From that moment on, Sheila began to feel frozen out by the others in her department and intimidated by her supervisor. *Id.* at 45. She tried to avoid communicating with her supervisor when at all possible. *Id.* at 44–45. Her supervisor would "belittle" her and, in Sheila's opinion, try to make her feel inadequate. *Id.* at 46, 50. Plaintiff was apparently not the only person subjected to Smith's conduct. S. Mears Dep. at 46.

Plaintiff saw her supervisor's conduct as a problem and sought to correct it by reporting it to upper management. *Id.* at 50–52. A senior manager directed her to see someone in personnel who turned out to be "very supportive [and] very understanding." *Id.* at 55. In the meantime, Sheila was under much stress as a result of the tensions that had developed within her department. She became paranoid that people in her supervisor's office were talking about her. *Id.* at 56–57.

Sheila met with her personnel contact and another member of senior management about

the situation. She often cried during this period and, at one point, was given a week off with pay in order to curb the tension. *Id.* at 61. When Sheila returned from this absence, management proposed moving her to another department. *Id.* at 62. Believing that she had done nothing wrong, Plaintiff resisted the transfer. *Id.* at 62. She finally acquiesced and was transferred to the pricing department. Although the job classification was lower than the one from which she transferred, Gulfstream maintained her salary at her pre-transfer level.

Her new department exploited Sheila's accounts receivable expertise by assigning her the task of generating an accounts receivable report. *Id.* at 67–68. There apparently was no one else in accounts receivable capable of producing the report. *Id.* This, coupled with the demands of learning her new job, caused even more stress for her. Also, employees in her old accounts receivable department would periodically call Sheila to ask her questions about tasks for which she formerly had responsibility. *Id.* at 68–69. These calls brought back unpleasant memories of Plaintiff's time in accounts receivable, though she also stated that she "loved" her old job and "wanted to be there so bad." *Id.*

In addition to this contact with her old department, pricing department employees asked her to go back to accounts receivable to pull invoices. *Id.* at 71–72. While no one in her former department would say or do anything unpleasant, the one or two times she went back to her old department, Sheila came back "crying and hysterical" both times. *Id.* at 71–72, 75. She also had to call her old department once every month to do a monthly report. *Id.* She did not interact with her former supervisor after transferring departments. *Id.* at 73.

Throughout this chain of events, Plaintiff did not suffer from any migraine headaches or any other documented illness. *Id.* at 59. She never told anyone at the company that she was suffering from any mental disorder. *Id.* at 101.

Sheila worked in the pricing department for five or six months, after which time she had to take two weeks off because of "stress" and "depression." *Id.* at 76. She returned to work after the two week absence and worked for two more weeks at which time the stress became too great and she left again in May of 1993. *Id.* Instead of resigning or being discharged, Plaintiff was given short term disability benefits which lasted 26 weeks. Hilderbrand Aff. ¶¶ 4–5. At the end of this period, Plaintiff was terminated in accordance with Gulfstream's policy, which only allows 26 weeks of paid leave. *Id.* at ¶ 6. After her termination, she applied for and received long term benefits retroactive to her date of termination. *Id.*

After leaving her day to day duties at Gulfstream, Mears was diagnosed as suffering from Dythmia and agoraphobia. Affs. of Drs. Stoneking and Heneisen. Her "exposure to people in the accounts receivable department ... exacerbated her condition and *caused her emotional disability.*" *Id.* (emphasis added).

Between 1987 and 1993 Sheila accumulated a total of 1,978 hours of medical leaves of absence. Hilderbrand Aff. ¶ 9. The majority of this time was for physical problems she had related to the birth of her children. Despite these recurrent and often lengthy absences, Gulfstream did not terminate Mears.

## II. Summary Judgment Standard

▇ The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56 advisory committee's note). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)); *see Goree v. Winnebago Indus., Inc.,* 958 F.2d 1537, 1539 (11th Cir.1992).

After the movant successfully discharges this initial burden, the burden shifts to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. *Thompson v. Metropolitan Multi-List, Inc.*, 934 F.2d 1566, 1583 n. 16 (11th Cir.1991); *see Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir.1991), *cert. denied*, 504 U.S. 1048, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992); *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991). The nonmovant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, [then] there is no genuine issue for trial." *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512.

In assessing whether the movant is entitled to summary judgment in its favor, the district court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir.1992); *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir.1991). The Court must avoid weighing conflicting evidence or making credibility determinations. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513–14. The Court's analysis ends "where there is no genuine issue of material fact and where the moving party is entitled to judgment as a matter of law." *Great Lakes Dredge & Dock Co. v. Tanker*, 957 F.2d 1575, 1578 (11th Cir.1992); *Real Estate Fin. v. Resolution Trust Corp.*, 950 F.2d 1540, 1543 (11th Cir. 1992) (both citing *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552).

## III. Analysis

Defendant seeks summary judgment on the ground that, while Plaintiff may have a disability, there is no reasonable accommodation Defendant could make which would render the Plaintiff otherwise qualified for a position at the company. Defendant also contends that there was no discrimination violating the ADA because no one at Gulfstream was aware of Mears' disability.

For her part, Plaintiff argues that the Defendant did not reasonably accommodate her disability. She contends that Gulfstream should have allowed her to continue working in accounts receivable, but disallowed any contact between her and her supervisor. Further, she alleges Gulfstream's continuous harassment caused her to develop agoraphobia and Dythmia.

### A. ADA

The ADA proscribes discrimination

against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). The ADA further states that discrimination includes "not making reasonable accommodations to the *known* physical or mental limitations of an otherwise qualified individual with a disability...." *Id.* § 12112(b)(5)(A) (emphasis added).

While there is little precedent in this circuit explaining the provisions of the ADA, cases decided under the Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq. (1993) do provide some guidance. The ADA itself, along with regulations and interpretive commentary, also provide illumination.

To prove discrimination under the ADA, the Plaintiff must prove (1) she has a disability, (2) she is, with or without reasonable accommodation, qualified to perform the essential functions of her job, and (3) she was discriminated against because of her disability. *Tyndall v. National Educ. Ctrs.*, 31 F.3d 209, 213 (4th Cir.1994). *Cf. Jackson v. Veterans Admin.*, 22 F.3d 277, 278 (11th Cir.1994) (stating requirements for proving claim under Rehabilitation Act of 1973), *cert. dis.* —— U.S. ——, 115 S.Ct. 657, 130 L.Ed.2d 560 (1994).

The evidence shows that Sheila was diagnosed with Dythmia and agoraphobia around the time she went on short term disability. Plaintiff also claims, in a befuddled manner, that she was disabled—due to her inability to handle stress—at the time she was transferred from the accounts receivable department. While this would normally be a question of fact for a jury, it is irrelevant to this holding since the Court finds the Plaintiff simply fails to meet the other two requirements for proving an ADA claim.

Since the Court presumes Plaintiff was a "disabled" person within the meaning of the ADA, it must now determine whether she was "qualified to perform the essential functions of her position" and whether there was a causal relationship between the discrimination or harassment and her disability.

### 1. "Qualified to Perform Essential Functions"

■ Only persons who are "qualified" for the job in question may bring a claim for discrimination under the ADA. 42 U.S.C. §§ 12111(8), 12112(a). The ADA defines a "qualified" person as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position [the] person holds or desires." 42 U.S.C. § 12111(8). To determine whether Sheila was "qualified" for the positions in accounts receivable or pricing, the Court must decide (1) if she could perform the "essential functions" of the jobs and (2) if not, whether a "reasonable accommodation" by Gulfstream would enable her to do so. *Tyndall*, 31 F.3d at 213.

At the time Plaintiff claimed she was constructively discharged from her employment (around the time she went on short term disability), she stated she "was under so much stress [she] could not function." S. Mears Dep. at 98. No matter what position the company offered her at that time, she could not have worked there. *Id.* at 77. She further stated "[t]here was no way I could go back." Against these assertions Gulfstream has maintained, and Sheila does not dispute, that her presence at the plant was "essential"

to performing her two jobs. Hilderbrand Aff. at ¶ 14.

■ Several courts have held that regular attendance can be an essential function of many jobs. *Jackson v. Veterans Admin.*, 22 F.3d 277, 279 (11th Cir.1994); *Tyndall*, 31 F.3d at 213; *Carr v. Reno*, 23 F.3d 525, 530 (D.C.Cir.1994). Since Plaintiff's disability precludes her from working at Gulfstream's facilities, which is an essential function of her job, she is not qualified to perform the essential functions of her job in pricing or accounts receivable. Since Sheila would not accept—indeed could not accept—any position at Gulfstream, there is no reasonable accommodation the company could make to enable her to perform the essential functions of any job at the company. Thus, the Plaintiff is not "qualified" for her job within the meaning of the ADA.

■ Sheila contends that Gulfstream could have accommodated her by allowing her to remain in accounts receivable without having any contact with her supervisor. S. Mears Statement of Facts at ¶ 5. While the employer is required to make a reasonable accommodation, "it is the responsibility of the individual with the disability to inform the employer an accommodation is needed." *Interpretive Guidance on Title I of the Americans with Disabilities Act*, 29 C.F.R. § 1630, Appendix at 407. First, there is no indication that Plaintiff suggested this accommodation while she was still actively employed at Gulfstream. Second, even if Sheila had suggested this "accommodation," the Court finds it is not a "reasonable accommodation." A "reasonable accommodation" is one that does not impose an undue hardship on the employer. *See id.* at 402. Requiring a company to employ a person in a particular department while forbidding her supervisor from having any contact with her would be an undue burden on the employer. Such a ludicrous notion would undermine the effectiveness and authority of management. Therefore, Plaintiff failed to request a "reasonable accommodation" during her employment.

Although Sheila did not request any accommodation, the Company did attempt to accommodate her by transferring her to a

different department in an attempt to resolve any problem she was having with her supervisor. Plaintiff resisted at first, but ultimately acquiesced. As it turned out, Plaintiff's new position was more stressful than her previous one. In addition to learning her new responsibilities, employees from accounts receivable would contact her to ask her questions about work in which she was competent. An essential function of Sheila's new position was to walk to other departments within the plant to collect invoices. She was required to contact accounts receivable once per month to collect information so she could prepare a monthly report. While preparing this report was a responsibility of her former position in accounts receivable, her supervisors gave her responsibility for it in pricing due to her competency. And, management requested that she go to accounts receivable to collect invoices "once or twice."

Sheila claims that if her supervisor in her new department had excused her from any contact with her former department, then she would have been able to perform the essential functions of her job. The Court disagrees. By her own admission, walking around the plant to other departments was a source of tremendous stress since she was always fearful of even a remote encounter with any of her former coworkers. In her words, "it was a constant panic, holding your breath, are you going to run into somebody from Harold or somebody that you just couldn't deal with handling." S. Mears Dep. at 77. Conversely, Sheila concedes that, when she came into contact with employees from the accounting department after the transfer, no one was unpleasant to her. Nor did she ever interact with her former supervisor after the transfer.

Making contact with other departments, both on the phone and in person, was an essential function of her job. Nothing Gulfstream could have reasonably done would have eradicated Plaintiff's paranoia of bumping into someone from accounts receivable while walking through the plant to do her job in pricing. Gulfstream, to accommodate Sheila, would have had to require employees from six different departments to deliver invoices to her. This would have disrupted six different departments, requiring six different people to do Plaintiff's job in addition to their own. Since an accommodation that adversely impacts other employees' ability to do their jobs is an undue burden on the employer, 29 C.F.R. § 1630.2(p)(2)(v), it is unreasonable. Therefore, given the Plaintiff's condition, the Court finds there was no reasonable accommodation Gulfstream could have made to enable her to perform the essential functions of her job in pricing.

### 2. Causal Relationship Between Discrimination and Handicap

██ Even if Plaintiff were qualified to perform the essential functions of her job, she has failed to show that any discrimination or harassment was causally connected to her disability. To prove an ADA claim, Plaintiff must show the discrimination was "because of [her] disability." 42 U.S.C. § 12112(a). Unlike Title VII, where the protected characteristic is evident, some handicaps, especially mental ones, are not evident. Therefore, a key part of the Plaintiff's case is showing that the employer had knowledge of the handicap and that there was a causal relation between the handicap and adverse event. *Hamm v. Runyon,* 51 F.3d 721 (7th Cir.1995).

██ Sheila has failed to allege, much less show, that any activity undertaken by Gulfstream was "because" of her disability. At the time Plaintiff claims she was constructively discharged, her agoraphobia and Dythmia had not yet been diagnosed. She at no time told anyone she had a disability.

After her condition was diagnosed, Gulfstream approved her short term disability, which she received for 26 weeks. At the end of that time, she was terminated in accordance with company policy, but given long term disability benefits. At that time, Plaintiff could no longer work at Gulfstream. The evidence shows that the company was extremely fair to her.

██ Furthermore, Sheila has shown that it is all of the stress related events that occurred while she was employed that *caused* the disability with which she has been for-

mally diagnosed. If the job itself caused the disability, the employer cannot fairly be accused of discriminating because of that disability, at least in cases such as this one, where the Plaintiff essentially stopped working because of a job-caused disability, then never came back. In that sense, she never gave the employer a "chance" to discriminate because of the disability.

■ In that regard, if Gulfstream's conduct did cause Plaintiff's disability, her remedy is under Georgia's worker compensation laws, not the ADA. Plaintiff has clearly missed the point of the ADA if she believes she can use it as a substitute for her real cause of action on which the statute of limitations has expired.

Finally, even if Sheila's low threshold for stress was a "disability," she has presented no evidence to show the company's conduct in the pricing and accounts receivable departments was related to or because of her condition. In other words, Plaintiff has failed to show anything beyond an objectively good faith effort to accommodate her.

### B. General Harassment Claim

Plaintiff next contends that requiring her to contact her old department once per month to compile a report, as well as allowing other employees to call her and ask questions relating to her competency in her former job, amounted to harassment that led to her constructive discharge. However, Plaintiff admits that the reason her former coworkers called her and asked her to compile the monthly report was because she was competent in those areas. S. Mears Dep. at 67–68. Sheila thus complains of nothing more than an employer utilizing the skills and competency of its employee. This is the very reason employers employ people. Plaintiff admits it was her competency, not her disability, that caused her coworkers' conduct. She in no way insinuates that this was some sort of pattern of harassment caused by her unusually low threshold for stress. There is not a scintilla of evidence in the record that anything Gulfstream or its employees did while Plaintiff worked there was because of, directed at, or related to any disability she might have had.

### C. Sexual Harassment Evidence

■ The Court notes that Sheila has alleged several instances of sexual harassment during her tenure at Gulfstream. Since Plaintiff does not allege this harassment was directed at her because of her disability, it has no relevance to her ADA claim. Much of it occurred prior to Plaintiff developing her heightened sensitivity to stress. Apparently Sheila waited too long to file a Title VII claim. The ADA, however, is not a catch-all remedy for sexual harassment claims on which the statute of limitations has run. There is a well developed body of law in place to deal with such claims. *See* Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

The evidence shows that Gulfstream has dealt with the Plaintiff as fairly as could be expected. The company afforded her time off with pay when times became too stressful, and has approved short term and long term disability benefits due to Plaintiff's disability. If the stresses of her jobs caused Plaintiff to develop a disability, then her remedy lies elsewhere in the law. The ADA only prohibits discrimination because of a person's disability.

### IV. CONCLUSION

Based upon the nature of Sheila Mears' disability, there is no reasonable accommodation Gulfstream could make that would enable her to perform the essential functions of either job she held while working for the Defendant. She has shown no evidence that Gulfstream discriminated against her because of her disability. Plaintiff has thus failed to carry the burden on her ADA claim. Accordingly, the Court **GRANTS** the Defendant's motion for summary judgment. Additionally, Plaintiff's Section 1983 is **DISMISSED** in accordance with its withdrawal at the August 24, 1995 status conference.

SO ORDERED.