**Robert L. FRIX, Plaintiff,**

v.

**FLORIDA TILE INDUSTRIES, INC., Defendant.**

**Civil Action No. 4:96–cv–067–HLM.**

United States District Court, N.D. Georgia, Rome Division.

July 11, 1997.

Todd Mitchell Johnson, Cook & Connelly, Summerville, GA, for plaintiff.

Robert L. Frix, Adairsville, GA, pro se.

Gavin Stone Appleby, Jona J. Miller, Powell, Goldstein, Frazer & Murphy, Atlanta, GA, for defendant.

### ORDER

HARLOD L. MURPHY, District Judge.

This employment discrimination case, in which Plaintiff claims Defendant violated the Americans with Disabilities Act ("ADA"), is before the Court on Defendant's Motion for Summary Judgment [14] and Defendant's Motion to Strike [22].

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) authorizes summary judgment when all "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." A district court "can only grant summary judgment 'if *everything* in the record ... demonstrates that no genuine issue of material fact exists.'" *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir. 1986) (quoting *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410 (5th Cir.1980)).

It has long been established that the party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir.1984). The moving party's burden is discharged by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In assessing whether the movant has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir.1993). Once the moving party has supported its motion adequately, the nonmovant has the burden of showing summary judgment is improper by coming forward with specific facts that demonstrate there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Ryder Int'l Corp. v. First American Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir.1991). Rather, the court only determines whether there are genuine issues of *material* fact to be tried. Applicable substantive law identifies those facts that are material. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510 ("[I]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). Disputed facts which do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment because such facts are not material. *Id.*

In addition to materiality, courts also must consider the genuineness of the alleged dispute. "[S]ummary judgment will not lie if the dispute about a material fact is *'genuine.'"* *Id.* (emphasis added). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Moreover, for factual issues to be genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at

587, 106 S.Ct. at 1356. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. at 1356. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587, 106 S.Ct. at 1356 (quoting *First Nat'l Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). "[T]his standard mirrors the standard for a directed verdict." *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. "[T]he inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512.

Within the context of employment discrimination, the Eleventh Circuit has "stressed . . . to district courts that, given the ease of pleading cases of discrimination, plaintiffs seeking to avoid summary judgment should be strictly held to the requirements of Rule 56(e); the plaintiff must present specific nonconclusory facts that would support a jury verdict against the particular defendant on discriminatory intent." *Ratliff v. DeKalb County,* 62 F.3d 338, 341 (11th Cir.1995).

## II. Background

Keeping in mind that, when deciding a motion for summary judgment, the Court "must view the evidence and all factual inferences in the light most favorable to the party opposing the motion," the Court gives the following statement of facts. *Reynolds v. Bridgestone/Firestone, Inc.,* 989 F.2d 465, 469 (11th Cir.1993). This statement does not represent actual findings of fact, and it is given simply to place the Court's legal analysis within the confines of a specific case or controversy.

Defendant Florida Tile ("Defendant" or "Florida Tile"), a producer of glazed ceramic tile, operates a manufacturing facility in Shannon, Georgia. In April 1981, Defendant hired Plaintiff as the storeroom coordinator in the maintenance department of its Shannon facility. (Plaintiff Dep. at 17, 21, 22.) The storeroom coordinator is responsible for purchasing, controlling, receiving and issuing maintenance-related stock, such as motors and machine parts. (*Id.* at 33–35, 36.)

Plaintiff's receiving duties consisted of unpackaging, identifying, lifting, carrying and shelving stock. (Plaintiff Dep. at 35.) Plaintiff therefore had to pry open crates with a hammer and crow bar, manually lift motors and parts out of the crates, carry them to shelves and pallet racks, and place them on the shelves and pallet racks. (*Id.* at 25–28.) Plaintiff often lifted, carried and shelved items weighing between 25 and 150 pounds. (*Id.* at 25–28.) In addition, Plaintiff lifted some items over his head by as much as four feet. (*Id.* at 26.)

In the mid–1980's, Defendant began producing larger, heavier tile. (Plaintiff Dep. at 35–36.) Consequently, the motors and parts that Plaintiff lifted, carried and shelved became larger and heavier, with most items weighing around 100 pounds. (*Id.* at 36.) Additionally, the quantity of motors and parts that Plaintiff received increased substantially, requiring more frequent lifting by Plaintiff. (*Id.* at 36.)

In August 1988, Plaintiff signed a job description outlining his responsibilities as storeroom coordinator. (Plaintiff Dep. at 126–27, Ex. 11.) The job description contains a section entitled "Physical Demands," which indicates that the storeroom coordinator is required to: (1) lift items weighing more than 45 pounds "many times" each week; (2) carry items weighing more than 45 pounds "many times" each week; (3) bend "many times" each week; and (4) stoop "many times" each week. (Plaintiff Dep. at 127–29, Ex. 11.)

On May 28, 1992, Plaintiff injured his back at Defendant's manufacturing facility when he lifted a part weighing approximately 100 pounds. (Plaintiff Dep. at 41, 107.) Plaintiff subsequently visited two physicians who diagnosed Plaintiff with a herniated disc and temporarily restricted Plaintiff from twisting, stooping, bending, or lifting more than 20 pounds. (*Id.* at 44.) Plaintiff's physicians monitored Plaintiff's condition and frequently renewed Plaintiff's temporary restrictions so

that the restrictions remained in effect until December 1994.[1] (*Id.* at 109–13.)

Following his back injury, Plaintiff asked Defendant to accommodate him by assigning other employees to help him lift and shelve "heavy" items. (Plaintiff Dep. at 51.) Defendant assigned three employees—Patti Green, Sherry Pilcher, and Henry Smith—to help Plaintiff lift and shelve parts. (*Id.* at 51–52, 54.) From May 1992 until November 1994, Ms. Green, Ms. Pilcher,[2] and Mr. Smith assisted Plaintiff on a daily basis. (*Id.* at 53–54; Green Dep. at 9; Pilcher Dep. at 6.) These employees assumed many of Plaintiff's duties, including prying open crates, lifting, and shelving items weighing more than 20 pounds. (Plaintiff Dep. at 54.) The employees assumed Plaintiff's duties in addition to their regular duties.[3]

Because Ms. Pilcher and Ms. Green regularly assisted Plaintiff with his lifting and shelving duties, Ms. Pilcher and Ms. Green were unable to complete their regular duties in a timely manner. (Pilcher Dep. at 7–8; Green Dep. at 6–7.) Ms. Green became so frustrated she asked Defendant to assign Plaintiff's regular duties to her, and her regular duties to Plaintiff.[4] (Green Dep. at 7.) Similarly, Ms. Pilcher informed her supervisor that she was frustrated because she was unable to complete her duties in a timely manner. (Pilcher Dep. at 9.)

In February 1994, Plaintiff's back condition worsened. (Plaintiff Dep. at 54–56, 117.) Dr. Mark Murphy, the physician who diagnosed Plaintiff's herniated disc, performed additional tests on Plaintiff's back. (*Id.* at 55.) On November 4, 1994, Dr. Murphy performed surgery on Plaintiff's back. (*Id.* at 56–57.) Although Plaintiff and Dr. Murphy believed Plaintiff's surgery was successful, Dr. Murphy did not believe Plaintiff should return to his position as storeroom

coordinator. (Plaintiff Dep. at 120, Ex. 9; Murphy Dep. at 13–14, 18–19.) On December 28, 1994, Dr. Murphy permanently restricted Plaintiff from repetitive bending, twisting, crawling, or lifting more than 25 pounds. (Murphy Dep. at 15, 26, Ex. 2.)

Plaintiff asked Dr. Murphy to relax Plaintiff's permanent lifting restriction to 50 pounds, but Dr. Murphy refused. (Plaintiff Dep. at 58–59, 123.) When asked why he wanted Dr. Murphy to relax his lifting restriction, Plaintiff responded:

[W]ell, *I was told when I was hired that I was required to lift 50 pounds: that was a requirement of my job.* And, so, I felt if he would raise it to 50 pounds I would be able to keep my job.

(*Id. at* 123 (emphasis added).)

Plaintiff returned to his position as storeroom coordinator on January 3, 1995. (Plaintiff Dep. at 60.) Ms. Green, Ms. Pilcher, and Mr. Smith continued to assist Plaintiff with his duties, in addition to performing their own duties. (*Id.*) In January or February 1995, Plaintiff informed his supervisors and Frank Shropshire, Defendant's Director of Human Resources, that Plaintiff's back was sore from performing "cleanup work" at one of Defendant's construction sites. (*Id.* at 61.) Plaintiff did not ask Defendant to make an accommodation for Plaintiff, other than providing Plaintiff continued assistance with heavy lifting. (*Id.*)

Mr. Shropshire informed Plaintiff that Defendant was going to transfer Plaintiff to a position in Defendant's production department that required no lifting. (Plaintiff Dep. at 62.) On February 2, 1995, Defendant transferred Plaintiff to a data position in the production department at the same level of pay. (*Id.* at 63, 64, 151.) Patti Green then became the storeroom coordinator. (*Id.* at

1. In December 1994, Plaintiff's lifting restriction was relaxed to 25 pounds and his restrictions became permanent.

2. Ms. Pilcher began assisting Plaintiff on July 12, 1993, the date she was hired as a supply clerk. (Pilcher Dep. at 4.)

3. Henry Smith was a "grounds and service man." (Plaintiff Dep. at 52.) Patti Green was a maintenance clerk. (*Id.* at 52–53; Green Dep. at

4.) Sherri Pilcher was a supply clerk in the storeroom. (Plaintiff Dep. at 53; Pilcher Dep. at 4.) Ms. Pilcher's duties included processing paperwork associated with "receiving" and entering inventory information into a computer. (Pilcher Dep. at 4.)

4. Ms. Green's regular duties did not include lifting or shelving.

69.) Once Ms. Green became the storeroom coordinator, Lamar Rich, a shop mechanic, assisted Ms. Green with lifting items that Ms. Green could not lift by herself. (*Id.* at 67; Green Dep. at 5.) Specifically, Mr. Rich assisted Ms. Green with lifting large $16 \times 16$ dye "punches" that weigh approximately 125 pounds. (Green Dep. at 5, 10; Plaintiff Dep. at 36.) Plaintiff is uncertain how frequently Mr. Rich assisted Ms. Green. (Plaintiff Dep. at 68.)

The primary duties of the production data position, which Plaintiff filled in February 1995, consisted of entering information into a computer and generating reports that outlined production volumes by line, color, and square footage. (Plaintiff Dep. at 62, 63–64.) The production data position required no lifting. (*Id.* at 62.)

On February 2, 1995, Plaintiff visited Dr. Murphy for a check-up. Plaintiff informed Dr. Murphy that Defendant was trying to accommodate Plaintiff's lifting restriction by transferring Plaintiff to the production data position. (Plaintiff Dep. at 125.) In his post-visit notations, Dr. Murphy stated:

> I think it is going to be important for [Plaintiff], over the long term, to adhere to the postoperative restrictions which I have placed. *I am pleased that his company is at least trying to accommodate these restrictions.*

(Plaintiff Dep., Ex. 10. (emphasis added).)

From February 1995 until April 1995, Don Beckham, Defendant's Production Manager, was Plaintiff's immediate supervisor. In April 1995, Steve Pak replaced Mr. Beckham. (Plaintiff Dep. at 70.) Soon thereafter, Mr. Pak decided to restructure the production data position. Mr. Pak's restructuring required Plaintiff to generate more sophisticated and detailed production reports. (*Id.* at 71.) Plaintiff informed Mr. Pak that Plaintiff did not possess the computer skills necessary to generate the new reports. (*Id.* at 71.) Specifically, Plaintiff did not possess sufficient knowledge of "Lotus 1–2–3" and "Ex-

cel," computer programs used to create accounting spreadsheets. (*Id.* at 71–72.)

Mr. Pak offered to provide Plaintiff with computer training if Plaintiff would sign a document stating that, once Plaintiff received training, Plaintiff would perform the duties of the production data position to Defendant's satisfaction. (Plaintiff Dep. at 73–74.) Plaintiff then asked Mr. Pak whether Plaintiff would receive a promotion if Plaintiff completed the training. (*Id.* at 74.) Mr. Pak responded by informing Plaintiff that Mr. Pak incrementally would assign Plaintiff six additional duties once Plaintiff completed the training, because Plaintiff first would have to reach a heightened level of performance.[5] (*Id.* at 74, 75.)

Because Plaintiff did not believe he could perform to Mr. Pak's satisfaction, Plaintiff refused to sign the document proposed by Mr. Pak.[6] (Plaintiff Dep. at 75.) Because Plaintiff refused to sign the document, and consequently refused training, Defendant posted an internal job search to fill the restructured production data position. (Plaintiff Dep. at 76.)

On June 5, 1995, Mr. Pak and Mr. Shropshire informed Plaintiff that Plaintiff would be laid off in 30 days, and that he would be subject to recall for one year. (Plaintiff Dep. at 82, 99.) At that time, Plaintiff did not ask Defendant to provide Plaintiff employment in another position. (*Id.* at 79.) Plaintiff did not seek employment in another position, because Plaintiff's workers' compensation representative informed Plaintiff it was not Plaintiff's responsibility to find another job with Defendant. (*Id.* at 79–80.)

Defendant hired Dawn Money to fill the restructured production data position. (Plaintiff Dep. at 76.) Ms. Money possessed experience in preparing reports for Defendant's management, and she already knew how to use Lotus 1–2–3 and Excel. (*Id.* at 77; Money Dep. at 10.) Defendant had Ms. Money sign a document that listed the duties Ms. Money was required to perform satisfac-

---

**5.** Plaintiff now interprets Mr. Pak's statement as meaning that Mr. Pak continuously would assign additional duties to Plaintiff so that Plaintiff never could satisfy Defendant's expectations. (Plaintiff Dep. at 74.)

**6.** Plaintiff believed the document would be used as a tool for discharging Plaintiff.

torily, and Ms. Money complied. (Money Dep. at 13–14.) Soon after Ms. Money filled the restructured production data position, Defendant provided Ms. Money with a private office and a new computer. (Plaintiff Dep. at 81–82.) Plaintiff had requested these amenities when Plaintiff was employed in the production data office, but Defendant refused Plaintiff's requests. (*Id.* at 82.)

During the last 15 days of Plaintiff's employment with Defendant, Plaintiff familiarized Ms. Money with the nature of the production reports Plaintiff had prepared. (Plaintiff Dep. at 81.) Plaintiff did not train Ms. Money on Lotus 1–2–3 or Excel. (*Id.*) Defendant laid off Plaintiff on July 1, 1995. (*Id.,* Ex. 18.)

Mr. Pak informed Plaintiff that Defendant was not considering Plaintiff for another position because, at the time Plaintiff was laid off, Defendant had no vacant positions which did not involve heavy lifting. (Plaintiff Dep. at 83, 97, 100.) "Defendant told Plaintiff that if Plaintiff could not identify another position that would be beneficial to the company in terms of costs savings, and that Plaintiff could perform within his physical limitations, he would be laid off." (Complaint ¶ 1.) When Plaintiff was laid off, he did not identify or suggest any positions he thought he was qualified to perform. (Plaintiff Dep. at 83.)

### III. Discussion

Defendant argues that summary judgment should be granted in its favor because (A) Plaintiff is not disabled under the ADA; (B) Plaintiff was not qualified to perform the essential functions of the storeroom coordinator position; (C) Plaintiff was discharged because Plaintiff was not qualified to perform the restructured production data position and Plaintiff failed to timely suggest a reasonable accommodation.

### A. Whether Plaintiff Is Disabled Under the ADA

Under the ADA, the term disability means, among other things, "a physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C.A. § 12102(2) (1995). Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i) (1996). Major life activities also include sitting, standing, lifting, and reaching. 29 C.F.R. Pt. 1630, App. § 1630.2(i) (1996). In short, "'[m]ajor life activities' are those basic activities that the average person in the general population can perform with little or no difficulty." *Id.*

With respect to the major life activity of working,

> [t]he term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i) (1996); *Gordon v. E.L. Hamm & Assoc., Inc.,* 100 F.3d 907, 912 (11th Cir.1996).

Thus, an impairment does not substantially limit an individual's ability to work simply because it prevents the individual from performing "'either a particular specialized job or a narrow range of jobs.'" *Pritchard v. Southern Co. Serv.,* 92 F.3d 1130, 1133 (11th Cir.) (quoting 29 C.F.R. Pt. 1630, App. § 1630.2(j)(3) (1996)), *amended on reh'g in part by,* 102 F.3d 1118 (11th Cir.1996).

■ Defendant argues that Plaintiff is not substantially limited in the major life activity of working because Plaintiff is precluded from performing only a narrow range of jobs (i.e., jobs requiring the employee to lift more than 25 pounds). A growing body of case law supports Defendant's argument. *Williams v. Channel Master Satellite Sys., Inc.,* 101 F.3d 346, 349 (4th Cir.1996) (holding as matter of law that "twenty-five pound lifting limitation—particularly when compared to an average person's abilities—does not constitute a significant restriction on one's ability to lift, work, or perform any other major life activity"); *Aucutt v. Six Flags Over Mid–America,* 85 F.3d 1311, 1319 (8th Cir.1996) (holding plaintiff failed to show plaintiff was substantially limited in major life activities where "a 25–pound lifting re-

striction was the only medical limitation placed upon [plaintiff's] activities"); *Ray v. Glidden Co.*, 85 F.3d 227, 228, 229 (5th Cir. 1996) (holding that inability to continuously lift containers weighing on average 44–56 pounds "does not render a person substantially limited in the major life activities of lifting or working"); *Wooten v. Farmland Foods*, 58 F.3d 382, 384, 386 (8th Cir.1995) (plaintiff not substantially limited in major life activity of working where plaintiff was restricted to light duty with no working in cold environment and no lifting items weighing more than 20 pounds).

This Court, however, rejects Defendant's argument, and the case law supporting the argument, because the Court believes Plaintiff's back impairment prevents Plaintiff from performing an entire class of jobs. "[A]n individual who has a back condition that prevents the individual from performing any heavy labor job [is] substantially limited in the major life activity of working because the individual's impairment eliminates his or her ability to perform a class of jobs." 29 C.F.R. Pt. 1630, App. § 1630.2(j) (1996).

In the present case, the permanent lifting restriction associated with Plaintiff's back impairment prevents Plaintiff from performing heavy labor jobs and medium labor jobs. *Cf.* 20 C.F.R. § 404.1567 (1997) (heavy labor jobs require lifting objects weighing up to 100 pounds with frequent lifting of objects weighing up to 50 pounds, and medium labor jobs require lifting objects weighing up to 50 pounds with frequent lifting of objects weighing up to 25 pounds). Plaintiff's impairment does not simply restrict Plaintiff from lifting the particular items stocked in Defendant's storeroom. Rather, Plaintiff's impairment prevents him from lifting *any* item weighing more than 25 pounds (e.g., a large crate of produce, a large bag of feed or fertilizer, a large roll of carpet, and etc.). Plaintiff's inability to repetitively bend and stoop further eliminates his capacity for performing the class of jobs requiring heavy to moderate lifting, because Plaintiff is unable to bend and lift objects from the ground. Finally, Plaintiff's impairment, and the restrictions associated with the impairment, are permanent in duration. *Gordon*, 100 F.3d at 911

(duration and long-term impact of impairment are relevant factors in determining disability). For all these reasons, the Court concludes Plaintiff is disabled under the ADA.

## B. Whether Plaintiff Was Qualified to Perform the Essential Functions of the Storeroom Coordinator Position

Even though Plaintiff is disabled, Plaintiff is entitled to protection under the ADA only if Plaintiff is a "qualified individual with a disability." 42 U.S.C.A. § 12111(8) (1995). In order to be a "qualified individual," Plaintiff must be able to perform the essential functions of the employment position at issue, either with or without reasonable accommodation. *Id.*

### 1. Whether Lifting Items Weighing More Than Twenty–Five Pounds Is an Essential Function of the Storeroom Coordinator Position

"The term *essential functions* means the fundamental job duties of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n) (1996). Evidence of whether a particular function is essential includes (1) "the employer's judgment as to what functions of a job are essential;" (2) written job descriptions prepared in a timely manner; (3) the amount of time spent on the job performing the particular function; and (4) the consequences of not requiring the job holder to perform the function. 42 U.S.C.A. § 12111(8); 29 C.F.R. § 1630.2(n)(3) (1996). In the present case, the evidence shows that lifting items weighing more than 25 pounds is an essential function of the storeroom coordinator position.

Defendant considers lifting objects weighing more than 25 pounds to be an essential function of the storeroom coordinator position. This factor is supported by Plaintiff's own testimony. Plaintiff has testified that, when Defendant hired Plaintiff, Defendant informed Plaintiff the storeroom coordinator was "required to lift 50 pounds; that was a requirement of [the] job." (Plaintiff Dep. at

123.) This factor also is supported by the written job description that Defendant prepared for the storeroom coordinator position.

In August 1988, Plaintiff and his supervisor signed a job description form that documents the frequency with which the storeroom coordinator is required to perform certain physical tasks. The form indicates the storeroom coordinator is required to lift and carry objects weighing 45 pounds or more "many times" each week. (Plaintiff Dep., Ex. 11 at 8.) The form also indicates the storeroom coordinator is required to stoop and bend "many times" each week. (*Id.*) Moreover, the record contains undisputed evidence that the storeroom coordinator must lift, carry, and shelve objects weighing more than 25 pounds on a daily basis. (Plaintiff Dep. at 53–54; Green Dep. at 9; Pilcher Dep. at 6.) Thus, undisputed evidence shows that the storeroom coordinator spends a substantial amount of time lifting, carrying and shelving items weighing more than 25 pounds, as well as bending and stooping.

■ Finally, undisputed evidence shows that, if the storeroom coordinator does not lift, carry and shelve items weighing more than 25 pounds, Defendant must divert up to three employees from their regular duties and have them perform the tasks. The evidence further shows that this practice causes the "diverted" employees to fall behind in the performance of their own regular duties. Given these factors, the Court concludes that lifting items weighing more than 25 pounds is an essential function of the storeroom coordinator position.[7]

**2. Whether Plaintiff Could Perform the Essential Lifting Functions of the Storeroom Coordinator Position With Reasonable Accommodation**

When Plaintiff's doctor first imposed lifting restrictions on Plaintiff, Plaintiff asked Defendant to accommodate Plaintiff by assigning other employees to assist Plaintiff with lifting items weighing more than 20 pounds. Initially, Defendant granted Plaintiff's request and assigned three employees to assist Plaintiff. These employees assisted Plaintiff until Defendant decided to transfer Plaintiff out of the storeroom and assign him to the production data position.

■ Plaintiff argues that Defendant should have continued to accommodate Plaintiff by having other employees lift items weighing more than 25 pounds. Plaintiff further argues that, with this accommodation, Plaintiff could perform the essential functions of the storeroom coordinator position. Defendant counters that the ADA does not require an employer to accommodate a disabled employee by assigning another employee to perform the essential functions of the disabled employee's position. The Court believes Defendant has the better argument for two reasons.

First, although an employer may be required to "restructure a job by reallocating or redistributing non-essential, marginal job functions.... *[a]n employer or other covered entity is not required to reallocate essential functions,*" such as the lifting duties performed by the storeroom coordinator. 29 C.F.R. Pt. 1630, App. § 1630.2(*o*) (1996) (emphasis added); *Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108, 1112–13 (8th Cir.1995) ("employer need not reallocate the essential functions of a job, which a qualified individual *must* perform"); *Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1124 (10th Cir. 1995) ("An employer is not required by the ADA to reallocate job duties in order to change the essential function of a job."); *Holbrook v. City of Alpharetta,* 911 F.Supp. 1524, 1541 (N.D.Ga.1995) (Carnes, J.) (ADA

---

**7.** The Court's conclusion is not altered by the fact that Ms. Green, Ms. Pilcher, and Mr. Smith performed many of Plaintiff's lifting duties for a substantial period of time. "That an employer utilizes for several years an alternative method for the performance of certain tasks that a disabled employee cannot perform ... does not ... suggest that the task, itself, is not essential." *Holbrook v. City of Alpharetta,* 911 F.Supp. 1524, 1540 (N.D.Ga.1995) (Carnes, J.), *aff'd,* 112 F.3d

1522 (11th Cir.1997). A contrary decision "could have the unfortunate effect of discouraging employers' willingness to be flexible in trying to accommodate disabled employees or applicants." *Id.* A generous employer may wish, initially, to reallocate certain essential tasks that a disabled employee cannot perform in order to assess whether such an approach is sufficiently cost-effective to be continued permanently, even though it is not legally required. *Id.*

does not require employer to reallocate or reassign essential functions of job), *aff'd,* 112 F.3d 1522 (11th Cir.1997); *Harden v. Delta Air Lines, Inc.,* 900 F.Supp. 493, 498 (S.D.Ga.1995) ("reasonable accommodation does not require the employer to reassign or eliminate an essential job function"). After all, if the employer reallocates the essential functions of a disabled employee's job, "the assistant would be performing the job for the individual with a disability rather than assisting the individual to perform the job." 29 C.F.R. Pt. 1630, App. § 1630.2(*o*).

■ Second, the accommodation suggested by Plaintiff caused the employees who assisted Plaintiff to fall behind in their regular duties. An accommodation that results in other employees being unable to complete their regular duties in a timely manner, or having to work longer hours in order to do so, is not required by the ADA. *Milton,* 53 F.3d at 1125 ("accommodation that would result in other employees having to work harder or longer hours is not required"); 29 C.F.R. 1630.2(p)(2)(v) (impact of accommodation on ability of other employees to perform their duties is relevant to reasonableness of accommodation). The Court therefore concludes that Defendant is entitled to summary judgment on the issue of whether Plaintiff could perform the essential lifting functions of the storeroom coordinator position with reasonable accommodation.[8]

### C. Whether Defendant Discharged Plaintiff Because Plaintiff Was Not Qualified to Perform the Essential Function of the Restructured Production Data Position and Failed to Timely Suggest a Reasonable Accommodation

In February 1995, Defendant transferred Plaintiff into the production data office.

Soon thereafter, Steve Pak, Defendant's new Production Manager, directed Plaintiff to generate more sophisticated production reports, which required use of Lotus 1–2–3 and Excel. Plaintiff informed Mr. Pak that Plaintiff did not have the computer skills necessary to generate the reports. Mr. Pak then offered to provide computer training for Plaintiff if Plaintiff would sign a document promising to perform in the · restructured production data position to Defendant's satisfaction. Plaintiff refused to sign the document, and consequently refused training, because Plaintiff believed he never would be able to satisfy Defendant's expectations and would be terminated.

■ Defendant argues that Plaintiff was not qualified to perform the essential function of the restructured production data position, and Defendant did not have a duty to train Plaintiff for the position. Defendant claims Defendant removed Plaintiff from the position and eventually discharged *Plaintiff* because Plaintiff was not qualified for the position and failed to timely request a reasonable accommodation.[9]

Plaintiff counters that Plaintiff was qualified for the position and that Defendant removed him from the position and discharged him because he is disabled. (Plaintiff's Response Brief at 4.) To support his position, Plaintiff argues: (1) Plaintiff would have been qualified for the position if Defendant had provided computer training for Plaintiff; (2) Plaintiff trained his replacement, who is not disabled; (3) Plaintiff's replacement received a new computer and a private office, amenities Plaintiff requested but did not receive; and (4) Mr. Pak "told [Plaintiff] in so many words that he would probably be terminated if he went forward with the training." (*Id.*)

---

**8.** The Court's conclusion on this issue is not altered by the fact that Lamar Rich, a shop mechanic, assisted Ms. Green, Plaintiff's replacement as storeroom coordinator, with lifting large, extremely heavy 16×16 dye "punches" that weigh approximately 125 pounds. Ms. Green lifted other objects weighing more than 25 pounds without assistance from Mr. Rich. (Green Dep. at 10.) Thus, unlike Plaintiff, Ms. Green did not require substantial and costly assistance from numerous employees. Ms. Green was un-

able to lift only a very narrow range of items. Plaintiff, on the other hand, cannot lift *anything* weighing more than 25 pounds. Furthermore, prior to his injury, Plaintiff also required assistance lifting extremely heavy objects. (Plaintiff Dep. at 25.)

**9.** Thus, Defendant has articulated a legitimate nondiscriminatory reason for discharging Plaintiff.

The Court rejects Plaintiff's first argument for two reasons. First, Defendant did not have a duty to provide Plaintiff with computer training. *Riley v. Weyerhaeuser Paper Co.*, 898 F.Supp. 324, 328 (W.D.N.C.1995) ("imposing an obligation on an employer to retrain a disabled employee in a new line of work goes far beyond the intended scope of the ADA to prevent employment discrimination against qualified individuals with disabilities"), *aff'd in part*, 77 F.3d 470 (4th Cir. 1996). Rather, Plaintiff had to possess the computer skills necessary to perform the production data position in the first instance. *Willis v. Conopco*, 108 F.3d 282, 284 (11th Cir.1997) ("Reassignment to another position is a required accommodation only if there is a vacant position available *for which the employee is otherwise qualified*."). Second, Defendant offered to provide Plaintiff with computer training, but Plaintiff refused the offer.

The Court also rejects Defendant's second argument. The fact Plaintiff familiarized his replacement with the nature of the data used to generate production reports does not establish that Plaintiff was qualified to perform the essential function of the restructured production data position. The essential function of the position was to process production data into relatively sophisticated reports using Lotus 1–2–3 and Excel. Although Plaintiff may have been familiar with the data used to generate the reports, Plaintiff admittedly did not know how to use Lotus 1–2–3 or Excel to process the data and generate the new production reports. Plaintiff's replacement, on the other hand, knew how to accomplish this task. The Court therefore concludes Plaintiff was not qualified to perform the restructured production data position.

The Court also rejects Defendant's third argument. The fact that Plaintiff's replacement received a new computer and a private office does not demonstrate discriminatory intent. Because Plaintiff's replacement filled a more demanding position in which she was required to generate more sophisticated reports than those generated by Plaintiff, it is not surprising Defendant provided her with a new computer and a private office. Furthermore, the argument is immaterial because it does not change the fact that Plaintiff was not qualified to perform the essential function of the restructured production data position.

The Court rejects Defendant's fourth argument that Mr. Pak "told him in so many words that he would probably be terminated if he went forward with the training." (Plaintiff's Response Brief at 4.) The record shows that, in response to Plaintiff's inquiry whether he would be promoted if he completed computer training, Mr. Pak stated that Mr. Pak incrementally would assign Plaintiff six additional duties once Plaintiff completed training, because Plaintiff had to reach a heightened level of performance in order to be promoted. (Plaintiff Dep. at 74, 75.) Plaintiff now argues that Mr. Pak's statement actually meant Mr. Pak continuously would increase Plaintiff's work load so that Plaintiff never could satisfy Defendant's expectations, and Defendant could discharge Plaintiff.

Plaintiff's interpretation of Mr. Pak's statement simply is not supported by the record. Additionally, the argument is immaterial because it does not change the fact that Plaintiff was not qualified to perform the essential function of the restructured production data position.

In sum, the Court concludes that no reasonable jury could find Defendant discharged Plaintiff because Plaintiff is disabled. To the contrary, the evidence shows Defendant removed Plaintiff from the production data position because, as Plaintiff has conceded, Plaintiff did not possess the computer skills necessary to perform the position.

■ In a final attempt to salvage his case, Plaintiff argues that Defendant should have reasonably accommodated Plaintiff by "bumping" an employee with less seniority than Plaintiff, and awarding Plaintiff the "bumped" employee's job. (Plaintiff's Response Brief at 5.) Plaintiff concedes the ADA does not require an employer to "bump" another employee. Plaintiff, however, argues that Defendant violated the ADA because "company policy had always allowed more senior nonsupervisory employees to 'bump' persons in lower positions upon a layoff [and] Florida Tile did not offer to do

**1038**

this in plaintiff's case, though they would have done so for a non-disabled employee in similar straits." (*Id.*) Plaintiff further argues that, under Defendant's "bumping" policy,

> the maintenance and storeroom clerk positions were "vacant" as regards the plaintiff. Failure to place plaintiff in either of the positions as would be done for any other similarly situated employee working at the plant was a violation of the ADA.

(Plaintiff's Response Brief at 6.)

Defendant counters that Plaintiff's argument is without merit because:

> [a]t the time of his layoff, Plaintiff did not request that Florida Tile "bump" another employee out of a job. Plaintiff raises this argument for the first time in response to Defendant's Motion for Summary Judgment.

(Defendant's Reply Brief at 10 n. 7.) The Court believes Plaintiff's argument is without merit for two reasons.

■ First, Plaintiff did not suggest that Defendant bump another employee out of a job until after Plaintiff filed this lawsuit. Generally, an employee has the burden of suggesting a desired accommodation at the time the disability in question presents a problem on the job. *Lewis v. Zilog, Inc.*, 908 F.Supp. 931, 946 (N.D.Ga.1995) ("Under the ADA, Plaintiff must offer Defendant a suggestion of a reasonable accommodation") (Hull, J.); *Fussell v. Georgia Ports Auth.*, 906 F.Supp. 1561, 1569 (S.D.Ga.1995) ("ADA claimant, who is in the best position to know what accommodation is needed, must request a reasonable accommodation at the time the disability in question presents a problem on the job") (Edenfield, J.), *aff'd*, 106 F.3d 417 (11th Cir.1997); *Mears v. Gulfstream*, 905 F.Supp. 1075, 1080 (S.D.Ga.1995) (rejecting plaintiff's ADA claim where "there is no indication that Plaintiff suggested this accommodation while she was still actively employed") (Edenfield, J.), *aff'd*, 87 F.3d 1331 (11th Cir. 1996). "[I]t is simply too late to raise suggested accommodations two years later in a

summary judgment response brief." [10] *Fussell*, 906 F.Supp. at 1570.

> Without this requirement the employee could casually mention a claimed disability, say nothing, wait to be terminated, then think up knew suggested accommodations years later while in the midst of ADA litigation. This would unfairly subject the employer to a "retro-discrimination" standard, where the employer "should have thought of" the accommodation at the time even if the employee did not.

(*Id.*)

Second, Defendant attempted to reasonably accommodate Plaintiff by placing Plaintiff in the production data department. Plaintiff readily admitted this fact to Dr. Murphy. (Plaintiff Dep. at 125, Ex. 10.) Plaintiff, however, subsequently rejected this accommodation by refusing to sign a document which stated that Plaintiff would perform the production data position to Defendant's satisfaction. Once Plaintiff rejected this accommodation, Defendant certainly was not required to accommodate Plaintiff by bumping another employee from his job. This is especially true given that Plaintiff did not even ask Defendant to bump another employee so that Plaintiff could take the employee's job. Given these two factors, the Court has little trouble concluding that Defendant did not discriminate against Plaintiff by failing to bump another employee out of his or her job.

## IV. Conclusion

ACCORDINGLY, the Court **GRANTS** Defendant's Motion for Summary Judgment [14] and **DENIES AS MOOT** Defendant's Motion to Strike [22].

IT IS SO ORDERED.

---

10. The Court's position on this matter is not changed by Plaintiff's assertion that he relied upon his workers' compensation representative to suggest a reasonable accommodation for him.

The burden to suggest a reasonable accommodation lies with Plaintiff, not his workers' compensation representative.